UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
JENNIFER LYON,                                            Case No. _____

                           Plaintiff,

                  -against-
                                                          **COMPLAINT**

PARAMOUNT GLOBAL fka VIACOMCBS INC.
and POSSIBLE PRODUCTIONS INC.

                           Defendants.
------------------------------------------------------------------X

        Jennifer Lyon, by and through her attorneys, Hogan & Rossi, complains of defendants as

follows:

                          **JURISDICTION AND VENUE**

        1.      This action seeks damages declaratory and injunctive relief against Defendants with

respect to Plaintiff's employment for: discrimination based on sex and age, retaliation, hostile work

environment, violation of the Massachusetts Wage Law and breach of contract.

        2.      Plaintiff, JENNIFER LYON, is a citizen of the State of Massachusetts, and resides

in the County of Berkshire.

        3.      Defendant, PARAMOUNT GLOBAL fka VIACOMCBS INC. [1] (hereinafter

"ViacomCBS"), and Defendant, POSSIBLE PRODUCTIONS INC. (hereinafter "Possible

Productions"), are each corporations organized and existing under the laws of the State of

Delaware and have their principal place of business at 51 West 52nd Street, New York, New York,

10019.

        4.      This Court has diversity jurisdiction over the parties pursuant to 28 U.S.C.

---

[1] On February 15, 2022, ViacomCBS Inc. announced that it was rebranding and would change its name to
Paramount Global beginning the following day.

§1332(a). Defendant is a citizen of the same state as Plaintiff and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

5.      Venue in this jurisdiction is proper pursuant to 28 U.S.C. §1391(c) because the Defendants are corporations. A corporation is deemed to reside in any judicial district where its contacts would be sufficient to subject it to personal jurisdiction at the time the action is commenced.

6.      At all relevant times herein, Defendants acted in the capacity of co-employers of Plaintiff, were the agents of each other, and in doing the things alleged herein, each defendant was acting within the course and scope of its agency and was subject to and under the supervision of its co-defendant.

7.      Jurisdiction of this Court is also invoked pursuant to 28 U.S.C. §§ 1331 (federal questions), 1343 (civil rights), Title VII of the Civil Rights act of 1964, as amended, 42 U.S.C. §§ 2000e, et seq. ("Title VII"), Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621, et seq. ("ADEA"), Massachusetts Law Against Discrimination (Mass. Gen. Laws Ann. ch. 151B) and Massachusetts Wage Law (Mass. Gen. Laws ch. 149, §§148, et seq.).

8.      All conditions precedent to the filing of this action have been fulfilled: (a) timely charges of employment discrimination were filed with the Equal Employment Opportunity Commission; (b) Notices of Right to Sue, copies which are attached hereto as Exhibit A-1 and A-2, were issued on August 1, 2022, and (c) this Complaint has been filed within ninety (90) days of receipt of the Notices of Right to Sue.

**PARTIES**

9.      Plaintiff, Jennifer Lyon, is a 49-year-old female who resides in Pittsfield, Massachusetts. Plaintiff was hired by Defendant Possible Productions and began working for the Defendants under the supervision of both Possible Productions and ViacomCBS on or about

2

October 14, 2020 as a Health and Safety Supervisor for Showtime's "DEXTER" reboot. Plaintiff was paid by Possible Productions. Plaintiff was hired in New York and the filming of "DEXTER" ultimately occurred in locations throughout central Massachusetts. Plaintiff was terminated by the Defendants on February 26, 2021.

10.     Defendants, ViacomCBS and Possible Productions are employers within the meaning of 42 U.S.C. § 2000e. Upon information and belief, Defendant ViacomCBS maintains its corporate headquarters in New York, New York and has over 20,000 employees. Upon information and belief, Defendant Possible Productions maintains its corporate headquarters in New York, New York and has over 35 employees.

## FACTS
### (Sex and Age Discrimination)

11.     Plaintiff was hired as the Health and Safety Supervisor for Showtime's "DEXTER" reboot on or about October 14, 2020.

12.     Plaintiff was hired by Possible Productions and began working for the Defendants under the supervision of both Possible Productions and ViacomCBS on or about October 14, 2020 as a Health and Safety Supervisor for Showtime's "DEXTER" reboot. Plaintiff was paid by Possible Productions. Plaintiff was hired in New York and the filming of "DEXTER" ultimately occurred in locations throughout central Massachusetts.

13.     The Health and Safety Supervisor position entails a great deal of responsibility and authority. Plaintiff's job was to ensure that all COVID-19 (hereinafter "COVID") protocols were followed, to manage contact tracing, COVID testing, enforce quarantine and isolation requirements for positive cases and to implement and enforce other relevant means to prevent the exposure and spread of COVID on set. Plaintiff's failure to perform these functions would impact the health and safety of all crewmembers and cast, delay production, and create financial

consequences for Defendants.

14.     From the beginning of Plaintiff's employment, she reported to David McElwain, a Vice President of Defendant ViacomCBS and locally to Adam Brightman (hereinafter "Adam"), who was the "DEXTER" Unit Production Manager and producer, and, upon information and belief, employed by Defendant Possible Productions.

15.     When it came to matters of health and safety, and particularly as relating to COVID, Plaintiff had independent authority and discretion to perform the health and safety functions of her position without needing to consult Adam or anyone else on set for "DEXTER." Plaintiff had the independent authority to halt production if it was, in her discretion, required pursuant to COVID protocols.

16.     Adam felt threatened by Plaintiff who was an older woman who was serious about protection of the crew and had the authority and discretion to enforce safety on set, even if such enforcement had an impact on production. Adam regularly acted to diminish the Plaintiff in the eyes of the "DEXTER" crew and denied her resources to do her job.

17.     Adam excluded Plaintiff from relevant meetings and participation in relevant conversations that directly impacted her job as Health and Safety Supervisor. As such, Adam not only prevented Plaintiff from directly obtaining all relevant information that could help her keep everyone on set safe, but also acted to isolate Plaintiff from important principals, and signaled to others that it was not necessary to include Plaintiff in conversations regarding health and safety on the "DEXTER" set.

18.     Adam consistently denied Plaintiff's requests to obtain the resources that she requested and required in order to perform her job. He used the lack of resources that resulted from these decisions on his part to denigrate Plaintiff and ultimately as a pretext for her termination.

19.     Adam hired another person, William Perkins ("William"), as a COVID Production

Supervisor, on November 9, 2020.

20.     Upon information and belief, Adam created the new position of COVID Production Supervisor without notifying David McElwain or Plaintiff. This position was duplicative of Plaintiff's position. William was hired in order to undermine Plaintiff's authority and to allow Adam to avoid dealing with her.

21.     William was inexperienced in COVID protocols. Plaintiff needed to train William in every aspect of COVID transmission protocols on set because he was unfamiliar with them, which interfered with her ability to perform her job. Plaintiff was delayed many hours by showing William what had to happen, rather than implementing it herself.

22.     Although Plaintiff was still the Health and Safety Supervisor, and primarily responsible of health and safety, including COVID, Plaintiff attempted to work with William, and to teach him relevant COVID protocols.

23.     Prior to William's start date, Lori Gerlach, the payroll accountant, sent an email addressed to Plaintiff and copied to Adam, on November 6, 2020, asking for William's title and start date. Adam immediately responded, "I'll answer that, he is not part of [Plaintiff's] team. COVID Production Supervisor. Monday." (See Exhibit B, the email chain discussing William's title and start date).

24.     Although Adam informed Plaintiff that William was not her superior, she was required by Adam to run everything past William, and to communicate important issues through William. Adam explicitly forbade Plaintiff and stated that only William would communicate with him regarding COVID issues. Plaintiff was thereby excluded from participating in major decisions that were directly within her job description. Adam also informed Plaintiff that she was no longer permitted to communicate directly to production and other departments and stated that William would do so. (See Exhibits C-1 and C-2, emails discussing that Plaintiff should be going through

William).

25.     A clear distinction in job descriptions of Plaintiff and William were never discussed, but Adam listed William above Plaintiff in every document, including Crew Lists and Call Sheets, despite the fact that "COVID" and "Health and Safety" were the same department in all matters relating to "DEXTER". (See Exhibit D, a partial "DEXTER" Crew List as of 1/26/21 – 3 out of 18 pages).

26.     William was selected to attend the morning meetings and budget meetings for Plaintiff's department instead of Plaintiff, even though her job duties included the oversight of operations and purchasing, and that she had prior relevant experience that William lacked.

27.     Adam blamed Plaintiff for any real or perceived problems in the COVID department while hamstringing Plaintiff's ability to deal with them by denying her authority, diminishing her in front of others and by denying her proper support.  She was, in effect, made the scapegoat for any problems and issues.

28.     On the other hand, William, who had the title of COVID Production Supervisor was not held responsible for real or perceived problems. Nor did Adam raise his voice to William, speak rudely to him, act condescendingly, question William inappropriately, or dress William down, as he did towards Plaintiff.

29.     The difference in Adam's treatment of Plaintiff and William was unrelated to their performance in their positions. Adam targeted Plaintiff because he could not accept Plaintiff, a competent middle-aged woman in a position of authority, and with discretion, in certain instances, that he did not have authority to countermand.

30.     Defendant ViacomCBS, even after being made aware of Adam's targeting of Plaintiff, failed to act to stop Adam's discriminatory conduct.

31.     Plaintiff was undermined in her work and because she was denied resources to

perform her job, her workload became untenable for one person.  Plaintiff was on-call twenty-four hours a day, seven days a week and required more crew to assist her.  Plaintiff was denied necessary resources and suffered from the hostile work environment created by Adam.

32.     Plaintiff was hired with the authority to hire and fire the COVID team, but later was not permitted to exercise that authority to hire the appropriate people. Plaintiff would attempt to staff her department with persons required to share responsibilities and take care of logistics and purchasing, but those persons would be rejected by Adam and Plaintiff would be blamed for not having enough staff.

33.     On about January 26, 2021 Plaintiff notified Adam and Bill that her workload was untenable for one person, and requested additional staff including a production assistant to help with paperwork, a medical person and logistics person who could work on ordering, invoicing and PPE distribution. Bill responded to the email stating that it confirmed his stated concern that Plaintiff was "under supported". Although Bill's response seemed to promise that Plaintiff would be able to choose and hire staff to support her, she was never permitted to do so. (See Exhibit E, an email that Plaintiff sent to Adam, and several other people, including Human Resources).

34.     Worse, Adam and, subsequently, Defendants, seized upon Plaintiff's email, falsely characterizing it as an admission that Plaintiff could not perform her job and using it as a pretext to terminate her after Plaintiff made a formal internal complaint of discrimination.

35.     Defendants continued to exclude Plaintiff from making hiring decisions relating to her staff, which decisions were delegated by Adam to William. On one occasion, because Plaintiff was unable to hire her own staff, Plaintiff informed William that they needed a new hire who was a medically based provider in testing, as well as someone who would contact trace and conduct medical oversight. Plaintiff also informed him that they needed coverage for notification. (See Exhibit F, specifically the email from February 9, 2021 at 4:55 AM, between Plaintiff and William

discussing new hire concerns).

36.     Instead of hiring a new employee with the qualifications requested by Plaintiff, William hired a non-medical employee without contact tracing experience and could not provide any medical oversight. The new hire therefore did not relieve the full burden of Plaintiff being on call twenty-four hours a day, seven days a week by herself.

37.     Production, with Plaintiff's input, hired a new Health Safety Manager ("HSM") through a company known as Reel Health. When the new HSM started, it became obvious to Plaintiff and others that he was not qualified. Plaintiff informed William, Adam, and Bill that the HSM employee wasn't coming to set, was found sleeping in his car, was late to set every day and refused outright to have people comply with the physical distancing on set. Plaintiff advised them that she instructed the new HSM employee that he needed to enforce the rules per the Joint Union Agreement, and he responded, "No one here is going to get COVID, we all get tested."  Adam and Bill ignored Plaintiff's concerns about this new hire. The following day, the HSM employee did not show up to work and never returned. Plaintiff was told by Adam that it was her fault that the new HSM quit.

38.     Employees from the production team, specifically Bill and Megan Jahoda (hereinafter "Megan"), an Associate Producer, canceled an important safety meeting with Mr. Erin Bromage, an epidemiologist, who consulted for the show.  Plaintiff was notified of the cancelation the day of the meeting that it had been cancelled by Megan, with the approval of Bill.  (See Exhibit G, an email chain from February 5, 2021 regarding the above referenced meeting).  Mr. Erin Bromage drove an hour for this meeting before he was informed of its cancelation. Since Plaintiff held the title of Health and Safety Supervisor with the apparent, but not actual, authority to schedule the meeting, the sudden cancelation made it appear that Plaintiff had canceled the meeting at the last minute, with inadequate notification.

39.     Adam had called Plaintiff on several occasions to instruct her to limit the persons that she was allowed to speak to on the production team. These calls were humiliating and inappropriate to Plaintiff. Adam informed Plaintiff that she could not email department heads, and that she could not email Human Resources without copying him and receiving his express permission. Upon information and belief, these constraints were not placed on any other comparable persons.

40.     Plaintiff was informed by Adam that under no circumstances should she contact Robert Hennessy, Vice President of Labor Relations for Defendant ViacomCBS. Only when Mr. Hennessy expressed to Adam that he expected Plaintiff to contact him directly did Adam allow her to contact Mr. Hennessy as part of Plaintiff's job.

41.     Plaintiff was also informed by Adam and Bill that she could not talk to Eric Weiler, a Production Designer.  Adam incorrectly told her, "That's not your job."  (See Exhibit H, emails specifically one from Adam to Plaintiff sent on December 2, 2020 at 8:41 PM instructing Plaintiff not to email Eric Weiler).  As the Health and Safety Supervisor, Plaintiff had compelling business reasons to contact Eric Weiler and all department heads but was directed not to, by both Adam and Bill.  Adam and Bill further contributed to the hostile work environment by refusing to allow Plaintiff to answer Eric Weiler regarding questions he had about a COVID situation in his department.

42.     Adam refused to permit Plaintiff to be in on relevant email chains, conversations, and meetings. Despite being directed by David McElwain in early January 2021 to permit Plaintiff's participation and allow her to do her job, Adam and Bill continued to discriminate against the Plaintiff.

43.     On or about February 18, 2021, Plaintiff was not invited to a ZOOM call to discuss a major splinter unit, which was something directly within her responsibility, and which it would

have been important for her to participate in. Plaintiff was only made aware of the call after Damon Gordon, the Assistant Unit Production Manager, sent her an email informing her what was discussed during the meeting. (See Exhibit I, an email from February 18, 2021 that Damon Gordon sent to Plaintiff).

44.    Adam insisted he needed to *proofread* Plaintiff's emails before she communicated with other departments. (See Exhibit H, emails, specifically one sent on December 2, 2021 at 8:18 PM from Plaintiff with a draft of an email that Adam had to proofread). Upon information and belief, Adam did not make similar demands on other male supervisors or on William. Moreover, there is no evidence of any mistakes made by the Plaintiff which would have required Adam to proofread her emails.

45.    On another occasion, Adam brought Plaintiff into his office to tell her that he was unhappy with the amount of money that Plaintiff was making in the position as Health and Safety Supervisor for "DEXTER", despite the fact that he made the offer to Plaintiff for the position. As further alleged below, Defendants willfully underpaid the Plaintiff.

46.    Adam frequently denigrated Plaintiff by subjecting her to verbal abuse, often in view of crew members. He deliberately undermined Plaintiff's authority in front of the crew. For example, in discussions where crew members were present regarding Plaintiff's COVID duties, Adam would state: "I don't believe you." "I don't think that's true." "No other show is doing that." "That doesn't sound right," and similarly dismissive comments.

47.    On multiple occasions, in front of other employees including Plaintiff's staff, Adam verbally attacked Plaintiff, falsely stating that she had no production experience and later that she had no television experience. Adam's verbal attacks were false, dismissive and were meant to undermine and diminish Plaintiff in the eyes of her staff and the crew.

48.    Adam would also often call/text/message Plaintiff with hostile, demeaning

messages.  Often, measures that Plaintiff took in the performance of her job would trigger a hostile and inappropriate response from him.

49.     Adam stated during at least two COVID-based meetings substantially, "I don't know why COVID has to be here," in which he was referring to Plaintiff.  In addition, Adam would shut off his monitor only when Plaintiff would speak during ZOOM sessions to indicate his dismissive attitude toward Plaintiff.

50.     When Plaintiff was dealing with a certain insubordinate employee, Adam told her that she needed to drop the issue and refused to even hear her out.  The insubordinate employee's poor behavior, by refusing to do most of the functions of her role, was being supported by Adam, who refused to permit Plaintiff to discipline her staff or to otherwise properly perform her job. Instead of permitting Plaintiff to discipline the insubordinate employee, Adam removed her from her reporting relationship with Plaintiff and directed the insubordinate employee report directly to him, which further substantially undermined Plaintiff's ability to run her department. The insubordinate employee would not respond to Plaintiff's calls or messages since she was only reporting to Adam, which created a situation where Plaintiff could not properly oversee her department. (See Exhibit E and Exhibit J, emails which show and discuss the employee insubordination). Adam's behavior toward Plaintiff seemed intended to humiliate her and to diminish her in front of her staff.

51.     On another occasion, in early December 2020, Plaintiff witnessed an employee enter her office and steal a COVID test kit.  Plaintiff informed Adam and Bill the next day.  After that incident occurred, someone sent in the test results from the kit that was stolen.  Plaintiff wrote up an incident report to Adam and Bill, documenting the incident. Defendants refused to allow Plaintiff to discipline the employee, and threatened Plaintiff with termination for making the report. In the end, nothing came of the theft or Plaintiff's incident report; the employee wasn't

fired or otherwise disciplined. (See Exhibit K, the email chain discussing the theft).

52.     Adam treated male 'second-in-commands' (HSM employees) with a completely different attitude. He looked at them when they entered the room, he answered when they spoke to him and he changed his manner, his tone, his affect, and demeanor. Moreover, Adam was not hostile to younger and less powerful women.

53.     Over the course of Plaintiff's employment, she brought the issues and concerns relative to the discrimination and hostile work environment Plaintiff was experiencing, to the attention of Adam, Bill and LaChondra Washington, the Director of Human Resources for the Showtime function of Defendent ViacomCBS.

54.     Plaintiff raised the issues relating to discrimination and hostile work environment with LaChondra Washington in early January 2021. Shortly thereafter, on February 13, 2021, Plaintiff filed a written internal discrimination complaint with Defendants. Her complaint appears to have been directed by Defendants to Jennifer Baker, the Vice President of Employee Relations at Defendant ViacomCBS to investigate and to LaChondra Washington (See Exhibit L, the Internal Discrimination Complaint).

55.     Plaintiff fully expected Defendants to properly investigate the allegations made in her February 21, 2021 complaint. Instead, the Defendants failed to perform a good faith investigation of Plaintiff's internal discrimination complaint, circled the wagons and protected Adam and Bill to Plaintiff's detriment and to the detriment of the health and safety of the "DEXTER" cast and crew. On February 23, 2021, only ten days after receiving Plaintiff's internal discrimination complaint, Plaintiff received a letter from Jennifer Baker, the Vice President of Human Relations at Defendant ViacomCBS, informing her that they were unable to substantiate that Adam had been discriminatory or otherwise violated Company policy. (See Exhibit M, closure letter dated February 23, 2021 from Jennifer Baker, the Vice President of Employee Relations at

Defendant ViacomCBS).

56. Adam's behavior was condoned with the facile "admission" that he could be negative and dismissive when communicating with colleagues. The Defendants ignored the regular specific instances of discrimination, hostile work environment and humiliation specifically directed toward Plaintiff.

57. Plaintiff was terminated on February 26, 2021, only 13 days after she lodged her internal discrimination complaint.

58. The termination of Plaintiff was due to her gender and age, and in retaliation for the internal discrimination complaint she filed with Human Resources. (See Exhibit N, the Separation Agreement from Kate Frame, Vice President of Human Resources at Defendant ViacomCBS).

## ADDITIONAL FACTS RELATING TO AGE CLAIMS

59. Plaintiff's employment documents list October 15, 2020 as her start date, but she started the job at the request of Adam and Bill on October 14, 2022. As such, Megan, an Associate Producer, began emailing Plaintiff regarding COVID testing in Massachusetts on October 14, 2020 (See Exhibit O, emails between Plaintiff and Megan Jahoda from October 14, 2020).

60. Plaintiff's weekly rate of pay was $4,900 per five day week, $980 per day, and $70 per hour, as well as listing overtime of not less than 1.5x paid for hours worked in excess of 8 hours per day of 40 per week. (See Exhibits P1 and P2, the Individual Deal Memo and the EP Start Form that Plaintiff signed on October 24, 2020).

61. At the commencement of employment, Adam and Bill requested that Plaintiff work full time. Adam, who was aware that Plaintiff was required to work more than full time in order to perform her job, paid her for only two (2) to three (3) days of work for the first few weeks even though she worked at least full time. Plaintiff contacted Adam to inform him that she needed more

days approved for payment, Adam responded by stating that he would only pay her two (2) days the first week and three (3) days the second week, despite the number of days she actually worked.

62.     Because of the exigent circumstances of the COVID epidemic and the lack of support provided to Plaintiff as set forth in this Complaint, Plaintiff worked seven days, every full week of employment, with the possible exception of 10/18/2020-10/24/2020 (6 days), 10/25/2020-10/31/2020 (6 days), 2/7/2021-2/13/2021 (6 days) and 2/21/2021-2/27/2021 (6 days).

63.     Plaintiff also worked on holidays, including Thanksgiving, Christmas, and New Year's Day.

64.     Adam had instructed Plaintiff not to submit her time records for weekend days that she worked, and, as such, she did not submit time records for weekend days and holidays until January 4, 2021, because Adam previously told her not to.

65.     Although Adam informed Plaintiff that she could not work overtime without prior permission, he was aware that the nature of her job required her to so to process and deal with COVID results in real time.  Defendants were aware that Plaintiff's position provided her with the authority and discretion to work the days and number of hours necessary in order to perform her health and safety functions during COVID. Defendant ViacomCBS was aware of Plaintiff's weekend work, including her communications on weekends. (See Exhibit Q-1, text messages between Plaintiff and Adam, where Adam informed her that he needed to approve her over time, and Exhibits Q-2 through Q-8, emails showing that she was working on weekends and holidays). Defendants relied upon Plaintiff's weekend work but intended not to pay her in accordance with the Deal Memo.

66.     Additionally, Defendants disregarded medical documentation requiring Plaintiff to rest because of illness.  Plaintiff obtained a sick note from the Set Physician stating that Plaintiff could not work for five (5) days, was not to be contacted and needed rest, but Adam disregarded

medical direction and was in contact with her four (4) hours later with work.

67.     Defendants failed to pay Plaintiff for the work that she performed, directly affecting the terms and conditions of her employment.

**AS AND FOR A FIRST CAUSE OF ACTION AGAINST
VIACOMCBS AND POSSIBLE PRODUCTIONS INC.
(SEX DISCRIMINATION – TITLE VII)**

68.     Paragraphs 1 through 67 are restated and realleged with the same force and effect as if more fully restated and realleged here.

69.     Title VII of the Civil Rights Act of 1964, as amended, makes it unlawful for an employer, "(1) to fail to refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §2000e-2(a).

70.     Plaintiff is a competent woman, experienced in COVID and health and safety protocols and experienced on set. Plaintiff's position necessarily required her to make independent decisions regarding health and safety, with the power to stop production in order to protect the health and safety of persons on set, which may have impacted the costs and the timing of production.

71.     Defendants discriminated against Plaintiff by discriminating against her because of her sex. The discrimination, as set forth in the Complaint, includes her unjust termination in February, 2021.

72.     Adam, in particular, targeted Plaintiff because she was an older woman who was

his peer, onset, and who had the authority to make decisions regarding health and safety that could impact Adam's production plans. It is the combination of Plaintiff's sex and the fact that she was not a young ingénue who was fully subordinate to Adam, that motivated the discrimination described herein. Plaintiff's sex was a determining factor and/or motivating factor in Defendants' actions.

73.     As a direct, legal, and proximate result of the discrimination, Plaintiff has sustained, and will continue to sustain, economic damages to be proven at trial. As a result of Defendants' actions, Plaintiff has suffered emotional distress, resulting in damages in an amount to be proven at trial. Plaintiff further seeks compensatory and punitive damages and all other injunctive, declaratory, and monetary relief available for discrimination at trial.

74.     Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiff's right to be free from discrimination based on sex.

## AS AND FOR A SECOND CAUSE OF ACTION AGAINST VIACOMCBS AND POSSIBLE PRODUCTIONS INC. (HOSTILE WORK ENVIRONMENT - TITLE VII)

75.     Paragraphs 1 through 74 are restated and realleged with the same force and effect as if more fully restated and realleged here.

76.     Under Title VII, a hostile work environment exists when the workplace is "permeated with discriminatory, intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter conditions of the victim's employment and create an abusive working environment."

77.     Defendants' agents' and employees' continuous conduct including Adam's conduct, was unwelcome by Plaintiff.

78.     Defendants' agents' and employees' continuous conduct was undertaken because of Plaintiff's sex, female. Adam, in particular, targeted plaintiff because she was an older woman

who was his peer, onset, and who had the authority to make decisions regarding health and safety that could impact Adam's production plans. It is the combination of Plaintiff's sex and the fact that she was not a young ingénue who was fully subordinate to Adam that motivated the discrimination described herein.

79.     The conduct was so severe or pervasive as to unreasonably interfere with Plaintiff's physical health and work performance that reasonable persons in Plaintiff's position would find their work environment to be intimidating, hostile, offensive or abusive.

80.     Plaintiff believed her work environment to be intimidating, hostile, offensive or abusive as a result of Defendants' agents' and employees' conduct.

81.     Management level employees knew of the abusive conduct. Plaintiff provided management level personnel, including Jennifer Baker and LaChondra Washington with information sufficient to raise a probability of discrimination in the mind of a reasonable employer. Moreover, the harassment was so pervasive and open that a reasonable employer would have had to have been aware of it.

82.     Defendants did not exercise reasonable care to prevent harassment in the workplace on the basis of sex and did not exercise reasonable care to promptly correct any harassing behavior that did occur.

83.     As a direct, legal, and proximate result of the discrimination, Plaintiff has sustained and will continue to sustain economic and emotional injuries, resulting in damages in an amount to be proven at trial.

84.     Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiff's right to be free from discrimination based on sex.

85.     Plaintiff is entitled to reasonable attorney's fees and costs of suit.

### AS AND FOR A THIRD CAUSE OF ACTION AGAINST
### VIACOMCBS AND POSSIBLE PRODUCTIONS INC.
### (RETAILIATION - TITLE VII)

86.     Paragraphs 1 through 85 are restated and realleged with the same force and effect as if more fully restated and realleged here.

87.     Section 704(a) of Title VII of the Civil Rights Act of 1964, as amended, prohibits employers from discriminating against an employee "because [she] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. §2000e-3(a).

88.     Plaintiff made informal and formal complaints to Defendants' agents and employees opposing Defendants' unlawful, discriminatory employment practices based on sex.

89.     Plaintiff's complaints were made reasonably and in good faith. Defendants' agents' and employees' actions created a hostile work environment and were used to retaliate against Plaintiff for her assertion of her rights.

90.     Despite Plaintiff bringing these issues to the attention of the appropriate persons, and because Defendants did not take her complaints seriously, performed a cursory investigation of her internal discrimination complaint, and deemed it unfounded a mere ten days after she filed it.

91.     Plaintiff was terminated three days thereafter in retaliation for her actions in complaining about the discriminatory treatment to which she had been subjected.

92.     Defendants' retaliatory actions were sufficient to deter a reasonable person from engaging in protected activity under Title VII.

93.     As a direct, legal and proximate result of Defendants' retaliation, Plaintiff has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

94.     Plaintiff is entitled to reasonable attorneys' fees and costs of suit.

## AS AND FOR A FOURTH CAUSE OF ACTION AGAINST VIACOMCBS AND POSSIBLE PRODUCTIONS INC. (AGE DISCRIMINATION - ADEA)

95.     Paragraphs 1 through 94 are restated and realleged with the same force and effect as if more fully restated and realleged here.

96.     Age Discrimination in Employment Act of 1967, as amended, makes it unlawful for an employer, "(1) to fail to refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age; (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or (3) to reduce the wage rate of any employee in order to comply with this chapter." 29 U.S.C. §623(a).

97.     The ADEA prohibits employment discrimination against persons 40 years of age or older. Plaintiff was 48 years old, qualified for her position and performing her job satisfactorily when Defendants fired her.

98.     Adam, in particular, targeted Plaintiff because she was an older woman who was his peer, onset, and who had the authority to make decisions regarding health and safety that could impact Adam's production plans. It is the combination of Plaintiff's sex and the fact that she was not a young ingénue who was fully subordinate to Adam that motivated the discrimination described herein. But for Plaintiff being perceived as an older female, she would not have been terminated.

99.     Upon information and belief, after she was terminated, Plaintiff was replaced by a younger individual.

100.    As a direct, legal and proximate result of the discrimination, Plaintiff has sustained, and will continue to sustain, economic damages to be proven at trial. As a result of Defendants' actions, Plaintiff has suffered emotional distress, resulting in damages in an amount to be proven at trial. Plaintiff further seeks compensatory and punitive damages and all other injunctive, declaratory, and monetary relief available for discrimination at trial.

101.    Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiff's rights under the ADEA to be free from discrimination based on age.

**AS AND FOR A FIFTH CAUSE OF ACTION AGAINST
VIACOMCBS AND POSSIBLE PRODUCTIONS INC.
(HOSTILE WORK ENVIRONMENT- ADEA)**

102.    Paragraphs 1 through 101 are restated and realleged with the same force and effect as if more fully restated and realleged here.

103.    The ADEA prohibits requiring people to work in a discriminatorily hostile or abusive environment. The standards for assessing hostile work environment under the ADEA are analogous to those utilized under Title VII. Thus, the ADEA is violated when the workplace is "permeated with discriminatory, intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter conditions of the victim's employment and create an abusive working environment."

104.    Defendants' agents' and employees' continuous conduct was not welcomed by Plaintiff.

105.    Defendants' agents' and employees' continuous conduct was undertaken because of Plaintiff's age, 49 years old.

106.    The conduct was so severe or pervasive as to unreasonably interfere with Plaintiff's physical health and work performance that reasonable persons in Plaintiff's position would find

their work environment to be intimidating, hostile, offensive or abusive.

107.    Plaintiff believed her work environment to be intimidating, hostile, offensive or abusive as a result of Defendants' agents' and employees' conduct.

108.    Management level employees knew of the abusive conduct. Plaintiff provided management level personnel, including Jennifer Baker and LaChondra Washington with information sufficient to raise a probability of discrimination in the mind of a reasonable employer. Moreover, the harassment was so pervasive and open that a reasonable employer would have had to have been aware of it.

109.    Defendants did not exercise reasonable care to prevent harassment in the workplace on the basis of age and did not exercise reasonable care to promptly correct any harassing behavior that did occur.

110.    As a direct, legal, and proximate result of the discrimination, Plaintiff has sustained and will continue to sustain economic and emotional injuries, resulting in damages in an amount to be proven at trial.

111.    Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiff's right to be free from discrimination based on age.

112.    Plaintiff is entitled to reasonable attorney's fees and costs of suit.

### AS AND FOR A SIXTH CAUSE OF ACTION AGAINST VIACOMCBS AND POSSIBLE PRODUCTIONS INC. (RETALIATION - ADEA)

113.    Paragraphs 1 through 112 are restated and realleged with the same force and effect as if more fully restated and realleged here.

114.    Section 623(d) of the Age Discrimination Employment Act of 1967, as amended, prohibits employers from discriminating against an employee "because [she] has opposed any practice made unlawful by this section, or because such individual … has made a charge, testified,

assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter."

115.    Plaintiff made informal and formal complaints to Defendants' agents and employees opposing Defendants' unlawful, discriminatory employment practices based on age.

116.    Plaintiff's complaints were made reasonably and in good faith. Defendants' agents' and employees' actions created a hostile work environment and were used to retaliate against Plaintiff for her assertion of her rights.

117.    Despite Plaintiff bringing these issues to the attention of the appropriate persons, Defendants did not take her complaints seriously, performed a cursory investigation of her internal discrimination complaint, and deemed it unfounded a mere ten days after she filed it.

118.    Plaintiff was terminated three days thereafter in retaliation for her actions in complaining about the discriminatory treatment to which she had been subjected because of the combination of her age and gender.

119.    Defendants' retaliatory actions were sufficient to deter a reasonable person from engaging in protected activity under the ADEA.

120.    As a direct, legal and proximate result of Defendants' retaliation, Plaintiff has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

**AS AND FOR A SEVENTH CAUSE OF ACTION AGAINST
VIACOMCBS AND POSSIBLE PRODUCTIONS INC.
(SEX AND AGE DISCRIMINATION- MASSACHUSETTS LAW
AGAINST DISCRIMINATION)**

121.    Paragraphs 1 through 120 are restated and realleged with the same force and effect as if more fully restated and realleged here.

122.    Massachusetts's Law Against Discrimination makes it unlawful for an employer to

discriminate against an individual because of sex or age (40 years or older). (Mass. Gen. Laws c.151B § 4[1] and § 4 [1][b]).

123.    Plaintiff has been discriminated against based on her sex and her age, and the combination of the two.

124.    Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiff's right to be free from discrimination based on sex and age.

125.    Plaintiff is entitled to reasonable attorneys' fees and costs of suit.

## AS AND FOR AN EIGHTH CAUSE OF ACTION AGAINST VIACOMCBS AND POSSIBLE PRODUCTIONS INC. (HOSTILE WORK ENVIRONMENT- MASSACHUSETTS LAW AGAINST DISCRIMINATION)

126.    Paragraphs 1 through  125 are restated and realleged with the same force and effect as if more fully restated and realleged here.

127.    A hostile work environment exists when the workplace is permeated with discriminatory, intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter conditions of the victim's employment and create an abusive working environment.

128.    Defendants' agents' and employees' continuous conduct was not welcomed by Plaintiff.

129.    Defendants' agents' and employees' continuous conduct was undertaken because of Plaintiff's sex, female, and her age (40 years or older).

130.    The conduct was so severe or pervasive as to unreasonably interfere with Plaintiff's physical health and work performance that reasonable persons in Plaintiff's position would find their work environment to be intimidating, hostile, offensive or abusive.

131.    Plaintiff believed her work environment to be intimidating, hostile, offensive or abusive as a result of Defendants' agents' and employees' conduct.

132.    Management level employees knew of the abusive conduct. Plaintiff provided management level personnel, including Jennifer Baker and LaChondra Washington with information sufficient to raise a probability of discrimination in the mind of a reasonable employer. Moreover, the harassment was so pervasive and open that a reasonable employer would have had to have been aware of it.

133.    Defendants did not exercise reasonable care to prevent harassment in the workplace on the basis of sex and age and did not exercise reasonable care to promptly correct any harassing behavior that did occur.

134.    As a direct, legal, and proximate result of the discrimination, Plaintiff has sustained and will continue to sustain economic and emotional injuries, resulting in damages in an amount to be proven at trial.

135.    Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiff's right to be free from discrimination based on sex and age.

136.    Plaintiff is entitled to reasonable attorney's fees and costs of suit.

### AS AND FOR A NINTH CAUSE OF ACTION AGAINST VIACOMCBS AND POSSIBLE PRODUCTIONS INC. (RETAILIATION - MASSACHUSETTS LAW AGAINST DISCRIMINATION)

137.    Paragraphs 1 through 136 are restated and realleged with the same force and effect as if more fully restated and realleged here.

138.    There are two different subsections that prohibit unlawful retaliation under the Massachusetts' Law Against Discrimination and they are §4(4) and §4(4A).

139.    Mass. Gen. Laws c.151B §4(4) states; "for any person, employer labor organization, or employment agency to discharge, expel or otherwise discriminate against any person because [s]he has opposed any practices forbidden under this chapter or because [s]he has

filed a complaint, testified, assisted in any proceeding under section five."

140.    Mass. Gen. Laws c.151B §4(4A) states that; "for any person to coerce, intimidate, threaten or interfere with such other person for having aided or encouraged any other person in the exercise or enjoyment or such right."

141.    Plaintiff made informal and formal complaints to Defendants' agents and employees opposing Defendants' unlawful, discriminatory employment practices based on sex and age.

142.    Plaintiff's complaints were made reasonably and in good faith. Defendants' agents' and employees' actions created a hostile work environment and were used to retaliate against Plaintiff for her assertion of her rights.

143.    Despite Plaintiff bringing these issues to the attention of the appropriate persons, Defendants did not take her complaints seriously, performed a cursory investigation of her internal discrimination complaint, and deemed it unfounded a mere ten days after she filed it.

144.    Plaintiff was terminated three days thereafter in retaliation for her actions in complaining about the discriminatory treatment to which she had been subjected.

145.    Defendants' retaliatory actions were sufficient to deter a reasonable person from engaging in protected activity under Massachusetts' Law Against Discrimination.

146.    As a direct, legal and proximate result of Defendants' retaliation, Plaintiff has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

### AS AND FOR A TENTH CAUSE OF ACTION AGAINST VIACOMCBS AND POSSIBLE PRODUCTIONS INC. (BREACH OF EMPLOYMENT CONTRACT – UNPAID WAGES)

147.    Paragraphs 1 through 146 are restated and realleged with the same force and effect as if more fully restated and realleged here.

148.    Defendants were co-employers with respect to the Plaintiff, each exercising joint control and supervision and acting as agents of the other with respect to Plaintiff's employment.

149.    Plaintiff and Defendants entered into a written employment agreement, including the "Individual Deal Memo" and the "EP Start Form", stating that Plaintiff's pay rate was $4,900 per week/5 days, $980 per day, and $70 per hour, as well as listing overtime of not less than 1.5x paid for hours worked in excess of 8 hours per day of 40 per week. (See Exhibits P-1 and P-2, the Individual Deal Memo and the EP Start Form that Plaintiff signed on October 24, 2020).

150.    Pursuant to the parties' agreement, Defendants agreed to compensate the Plaintiff at the terms specified above.

151.    An essential term of the employment agreement was that the Defendants would pay Plaintiff according to the terms of said agreement.

152.    Defendants have willfully failed to pay Plaintiff for the work she performed.

153.    Plaintiff has been damaged due to Defendants' willful failure to pay Plaintiff the appropriate agreed upon wages.

154.    By reason of the foregoing, as a result of Defendants' breach of contract, Plaintiff has been damaged in the amount of $37,730 plus pre- and post-judgment interest, reasonable attorney's fees, and the costs and disbursements of this action.

### AS AND FOR AN ELEVENTH CAUSE OF ACTION AGAINST VIACOMCBS AND POSSIBLE PRODUCTIONS INC. (VIOLATION OF MASSACHUSETTS WAGE ACT – TREBLE DAMAGES)

155.    Paragraphs 1 through 154 are restated and realleged with the same force and effect as if more fully restated and realleged here.

156.    The Massachusetts Weekly Wage Law, (hereinafter the "Massachusetts Wage Act") requires that employees must be paid all wages they've earned on either a weekly or biweekly basis, and employers must pay an employee on the day of discharge (terminated or laid

26

off) all wages earned, including holiday pay (Mass. Gen. Laws ch. 149 §148).

157.    The Massachusetts Overtime Act states that employers generally must pay their employees 1.5 times the regular rate of pay for hours worked over 40 in a workweek (Mass. Gen. Laws ch. 151 §1A).

158.    Under the Massachusetts Wage Act (Mass. Gen. Laws ch. 149 §150) when an employer violates Massachusetts's employment laws, the employee may be eligible for three times (treble) what is owed to the employee as well as attorney's fees. Employers failing to make payment of earned wages within the time required by the Massachusetts Wage Act are liable for damages equal to three times the amount of the late payment.

159.    Defendants have willfully failed to pay Plaintiff for the work she performed.

160.    Plaintiff has been damaged due to Defendants' willful failure to pay Plaintiff the appropriate agreed upon wages.

161.    Plaintiff is entitled to treble damages as she was not paid all the wages she earned, including overtime, on the day she was terminated.

162.    By reason of the foregoing, as a result of Defendants' willful failure to pay Plaintiff all the wages she earned, Plaintiff has been damaged in the amount of $113,190 plus pre- and post-judgment interest, reasonable attorney's fees, and the costs and disbursements of this action.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully prays that this Court:

1.    Assume jurisdiction of the action.

2.    Issue a declaratory injunction that the acts of defendants complained of were in violation of the aforementioned laws;

3.    Order defendants to make Plaintiff whole for all earnings and other benefits she would have received but for defendants' violations of law, including but not limited to: wages

(front pay and back pay), and other lost benefits, with prejudgment interest thereon;

4.     Order defendants to pay Plaintiff compensatory and punitive damages for injuries, including emotional distress, suffered as a result of defendants' violation of the aforementioned laws;

5.     Order Defendants to pay triple damages for unpaid wages under the Massachusetts Wage Law;

6.     For reasonable attorneys' fees and costs of suit; and

7.     For such other further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues.

Dated:          October 27, 2022
                Brewster, New York

                                        Respectfully submitted,
                                        Hogan & Rossi

                                        /s/ *Scott J. Steiner*
                                        BY: SCOTT J. STEINER
                                        Attorney for Plaintiff
                                        3 Starr Ridge Road
                                        Brewster, New York 10509
                                        (845) 279-2986