UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JENNIFER LYON,

                              Plaintiff,

              -against-

PARAMOUNT GLOBAL f/k/a VIACOMCBS
INC., et al.,

                              Defendants.

22-CV-9229 (JGLC)

**OPINION AND ORDER**

JESSICA G. L. CLARKE, United States District Judge:

In October of 2020, Plaintiff—a woman in her late 40s—was hired as the Health and

Safety Supervisor for the limited series reboot of the show *Dexter: New Blood.* Plaintiff

interviewed, and worked closely with, Adam Brightman, the Unit Production Manager and

Producer, and Bill Carraro, the Executive Producer. Plaintiff dealt with an array of issues during

her tenure, including understaffing, high employee turnover, altercations with other individuals,

and difficulty completing projects within allotted timelines. On at least a few occasions, Plaintiff

complained to Human Resources regarding these issues, most notably her belief that Adam

Brightman berated her, undermined her role, and made concerning remarks. Plaintiff eventually

filed a formal, internal complaint with Human Resources in February 2021 alleging a hostile

work environment. A subsequent investigation into Lyon's complaint—which involved

interviewing her and many other members of the production—found her discrimination claims

could not be substantiated. Lyon was fired from her position shortly thereafter and was

immediately replaced. The production wrapped up in July 2021.

On October 27, 2022, Plaintiff filed this action for damages and declaratory and

injunctive relief alleging employment discrimination based on sex and age, retaliation, and

harassment due to a hostile work environment. Plaintiff also asserts claims under the

Massachusetts Wage Law and for breach of contract, claiming she has not fully been paid for days she worked or appropriately paid overtime.

Defendants now seek summary judgment on Plaintiff's claims, arguing that she cannot establish a prima facie case of discrimination, harassment, or retaliation, and that Defendants had a justifiable, non-discriminatory basis to terminate her employment. Defendants also seek summary judgment on Plaintiff's wage claims, insisting she has already been paid for all time recorded. Finally, Defendants move this Court for sanctions—either in the form of an adverse inference, or dismissal of claims—due to Plaintiff's alleged spoliation of evidence. Specifically, Defendants allege that Plaintiff failed to preserve any cell phone data from the entire four-month period she worked on the production.

For the reasons set forth below, the Court GRANTS Defendants' motion for summary judgment and DENIES their request for sanctions as moot.

## BACKGROUND

The following facts are taken from the parties' Rule 56.1 Statements and accompanying exhibits. Unless otherwise indicated, the Court only cites a 56.1 statement where (1) the parties have agreed the factual assertion is undisputed; and (2) the factual assertion is properly supported by a citation to the record. This includes instances where a party does not truly "dispute" an assertion, but merely seeks to qualify or add their own "spin" to it. *See Kaye v. New York City Health and Hosps. Corp.*, No. 18-CV-12137 (JPC), 2023 WL 2745556, at *2 n.2 (S.D.N.Y. Mar.

31, 2023). The Court otherwise cites to the exhibits filed by the parties in connection with the instant motions, and any relevant pleadings in this case.[1]

## I.    Factual Background

Defendant Possible Productions Inc. ("Possible") hired Plaintiff in October 2020 to work as the Health and Safety Supervisor ("HSS") for the limited series reboot, *Dexter: New Blood* (the "Production"). ECF No. 69 ("Joint SMF") ¶ 1. The Health and Safety Supervisor title was interchangeable with "Covid Compliance Supervisor." ECF No. 71-1 at 119:6–12; ECF No. 79[2] ¶¶ 22, 23. Prior to joining the Production, Lyon worked as the COVID-19 Compliance Supervisor for the HBO Max Series, *The Flight Attendant*, which was filmed in New York. ECF No. 71-1 at 55:4–8.

### A.    Lyon's Hiring and Early Remote Work

Lyon interviewed for the HSS position with Adam Brightman, the Unit Production Manager and Producer, and Bill Carraro, the Executive Producer. Joint SMF ¶ 2. Lyon was 47 years old when she interviewed. *Id.* ¶ 3. Carrara and Brightman are more than a decade older

---

[1] The Court notes that, in several instances, Plaintiff's counter-statement of facts (*see* ECF No. 79): (i) include citations that do not allow the Court to identify the relevant record material because they only cite Bates numbers from discovery that are not clearly identified in the declaration (*id.* ¶¶ 81, 84, 85); (ii) purport to cite material that is not actually contained in the relevant exhibit (*id.* ¶¶ 32 (citing pages from Brightman transcript, but the referenced pages are not included), 47 (several pages in citation not included in excerpted pages)); and (iii) appear to cite incorrect exhibit numbers such that the document referenced does not match the exhibit referenced (*id.* ¶¶ 32, 37, 38). Indeed, some factual assertions have no record support at all. *Id.* ¶¶ 78–80. The Court need not, and will not, consider any of these assertions. *Amnesty America v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) (noting Rule 56 "does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute" and confirming a district court is entitled to order litigants to provide specific record citations); *Healthfirst, Inc. v. Medco Health Solutions, Inc.*, No. 03-CV-5164 (RLC), 2006 WL 3711567, at *5 (S.D.N.Y. Dec. 15, 2006) ("Under the law of this Circuit, where there are no citations or where the cited materials do not support the factual assertions in the [56.1 statements], the court is free to disregard the assertion.") (cleaned up).

[2] Plaintiff's 56.1 counter-statement of facts begins on page 81 of this filing.

than Lyon. Joint SMF ¶ 4. During the interview process, Carraro and Brightman discussed with Lyon whether she would be able to hire additional staff from her past project. ECF No. 71-1 at 60:4–12. Brightman testified that he and Carraro originally expected that Lyon would bring one or more staff members from *The Flight Attendant* team. ECF No. 71-4 at 71:1–6. For example, they discussed the possibility of Lyon bringing over Dewey Caddell, who served as Lyon's second in command for *The Flight Attendant*. ECF No. 71-1 at 59:4–19. Lyon was confident she could hire additional staff, but testified her ability to do so would depend on the Production's filming location. ECF No. 71-1 at 60:4–25. Ultimately, Lyon did not hire any of these individuals because they were hired for other projects. ECF No. 71-1 at 61:9–62:3; ECF No. 71-4 at 71:15–17. Brightman offered Lyon the HSS position on or around October 19, 2020. Joint SMF ¶ 5; ECF No. 71-8.

As HSS, Lyon was the head of the Health and Safety Department, and she maintained that position until her termination in February of 2021. Joint SMF ¶¶ 9–10. Lyon reported to Brightman and Carraro. ECF No. 79 ¶ 44. Lyon also reported to David McElwain (Vice President, Environmental, Health and Safety). ECF No. 70 ("Def. 56.1") ¶ 4. In her role, Lyon was to act as "the COVID-19 Compliance Officer," which included, among other things, assisting with hiring a Health and Safety Coordinator and other safety personnel, and deploying a COVID safety plan that complied with applicable rules, laws, and regulations. ECF No. 71-1 at 104:5–25, 132:13–16; ECF No. 71-14.

The COVID-19 Return to Work Agreement (the "RTW Agreement") dated September 21, 2020, also detailed responsibilities and authority Lyon was to have in her role at the Production. ECF No. 78-21. The RTW Agreement was a contract among movie directors, producers, unions, and state employees to observe, implement, and require various COVID-19 protocols. *Id.* As to Lyon, the RTW Agreement permitted her to pause production or other work activities if she

4

identified a health and safety concern, *id.* at WP 0016, and to recommend discipline or termination for violations of the health and safety protocols. *Id.* Those decisions could not be overridden by Brightman or Carraro. ECF No. 78-2 at 27:15–28:5.

Lyon finished working on *The Flight Attendant* on October 20, 2020, and then had a "soft ramp up period" until she was scheduled to begin full-time and in person work for the Production. Def. 56.1 ¶¶ 185–187. Lyon did not work on *The Flight Attendant* and the Production at the same time. *Id.* ¶ 184. Lyon testified she understood that the Production expected her to tackle certain issues with high priority. ECF No 71-1 at 107:23–108:7; *see also* ECF No. 71-13 at P 0002837. Among them were: "(1) Identify Covid Compliance Team Positions and Chain of command;" (2) "Hire Covid Compliance Team Members;" and (3) "Complete Long Form[.]" ECF No. 71-13 at P 0002838.

### B.    Lyon's Hours and Wages

Lyon signed her Deal Memo on October 24, 2020, and was to be paid $4,900 per five-day week, $980 per day, and $70 per hour. Joint SMF ¶¶ 6–7; ECF No. 71-1 at 62:23–65:10; ECF No. 71-8. During the initial ramp up period, Brightman directed Lyon to work remotely on a limited schedule of 1-2 days a week. ECF No. 71-70 at P 0002929. Lyon began full-time, in person work on November 2, 2020, at New England Studio in Devens, Massachusetts. Def. 56.1 ¶ 22; ECF No. 71-1 at 123:17–21. Lyon was expected to work 60 hours a week, with no allowance for overtime. Def. 56.1 ¶ 199; ECF No. 71-70 at P 0002928.

The Deal Memo also makes clear that the terms of the "Conditional Employment & Accounting Policies" governed Lyon's employment. ECF No. 71-8. Under these policies, she was required to fill out a timecard weekly, and she was required to seek approval of any overtime, 6th or 7th days, or holidays had to be approved by the Unit Production Manager or Producer (i.e., Brightman) in advance. Def. 56.1 ¶ 197. Despite this, Lyon worked additional

days without prior approval. *Id.* ¶ 200. For instance, during the initial ramp up period, Lyon emailed Brightman her timecard was "much more" than the 1-2 days they had discussed. ECF No. 71-70. Regardless, Lyon was paid for this additional time. Def. 56.1 ¶¶ 189, 190. Lyon was also paid for working a 6th day during the weeks of January 9, January 23, and January 30, 2021, and she was paid for a 6th and 7th day the week of February 13, 2021. Def. 56.1 ¶ 200 Lyon testified there was never an occasion where she requested prior approval to work a sixth or seventh day, and it was denied. Def. 56.1 ¶ 204.

### C.     Hiring of William Perkins & His Role at the Production

On November 1, 2020, around the same time Lyon began full time in-person work, the Production hired William Perkins as COVID Production Supervisor. Joint SMF ¶ 11; ECF No. 78-4 at POSSIBLE PRODUCTIONS 000998. Perkins is older than Lyon. Joint SMF ¶ 12. Brightman had previously hired Perkins as the Production Supervisor for another project called *The Enemy Within*. Def. 56.1 ¶¶ 34, 35. Carraro and Perkins also knew each other (but never met in person), having previously volunteered for a COVID response alliance for producers and production managers. ECF No. 71-5 at 21:15–22:19. On November 7, 2020, Lyon expressed concern regarding the reason for hiring Perkins, writing to Brightman "I believe you brought [Perkins] in because you think I don't know what I am doing." Def. 56.1 ¶ 48; ECF No. 71-20 at AB 00172. Brightman responded by writing that "William [Perkins] is not with us because of you – he is a part of the production team who would have been hired no matter who or how the Covid team is comprised[.]" Def. 56.1 ¶ 50.

Perkins signed his Deal Memo on November 11, 2020. ECF No. 78-4 at POSSIBLE PRODUCTIONS 000998. The Deal Memo further provided Perkins was to be paid $4,650/week as "Studio Compensation," and $4,949/week for "Distant Compensation," and indicated Perkins was designated to the Health and Safety department. *Id.* Perkins, like Lyon, reported to

Brightman and Carraro. ECF No. 79 ¶ 44. Perkins did not report to Lyon. Def. 56.1 ¶ 42. Lyon also indicated at one point to LaChondra Washington that two "coordinators" reported directly to Perkins. ECF No. 79 ¶ 49. Perkins's and Lyon's roles overlapped, and the precise nature of Perkins's role was not always clear. For instance, both Lyon and Perkins worked on the "Long Form." *Id.* ¶ 47. Brightman testified that Perkins worked in the production department, but that he was "specifically there to work with the Covid department" and to interface with them and support them. ECF No. 71-4 at 74:20–75:13; 76:4–12; ECF No. 71-1 at 132:17–23. Carraro testified he understood Perkins's duties to be "[t]o work as a liaison with the production and the health and safety department supervising COVID protocol." ECF No. 71-5 at 27:10–23. Perkins testified that his understanding was he would be "involved participating in the health and safety department" on the Production. ECF No. 78-4 at 38:14–24. Perkins also testified his understanding, as of the date he was hired, was that he was being hired to the Health and Safety department. *Id.* at 36:1–9. Certain documents, including call sheets, also showed Perkins as part of the Covid department. *See, e.g.,* ECF No. 78-64 at P 0001607.

At times, Brightman corresponded with both Lyon and Perkins to clarify their differing responsibilities and priorities. For example, on December 29, 2020, Lyon complained to Brightman that another department head had demanded Lyon allow new employees to be cleared the same day, and that she did not "want or need" that pressure. ECF No. 79 ¶ 41. Brightman agreed, and instructed Lyon to "defer" questions from other department heads and crew members to Perkins given his "experience in management of crew." *Id.* ¶ 42. Brightman also requested they "all try to stay more in [their] lanes" and that Lyon should rely on others, including Brightman, for crew communication. *Id.* Brightman testified the intent behind his email was to leave Lyon free to focus on her priorities. ECF No. 87-3 at 84:15–22.

### D.    Brightman and Carraro's Concerns Regarding Lyon

It did not take long for Lyon, Brightman, and Carraro to raise concerns regarding Lyon's performance. For instance, on October 19, 2020, during Lyon's soft ramp up period, Brightman texted Bonnie Munoz (whose title is not in the record), saying he "already sense[d] a lack of initiative" from Lyon. ECF No. 71-11. On November 7, 2020, Lyon emailed Brightman, Carraro, and Perkins writing, among other things, that being "pulled away from what I know is higher priorities is a recipe for failure." ECF No. 71-20 at AB 00171. Lyon also acknowledged frustration "for not being able to have proper tracking measures in place," being unable "to hire main members of [her] team," and that "other high priority items haven't even been started." *Id.* at AB 00171–72. That same day, Brightman noted Lyon was "potentially becoming a liability" and requested Carraro "think about some alternate ideas for HSS" but that he was "not giving up on [Lyon] yet." *Id.* at AB 00171. Carraro noted in response that Lyon had "an overwhelming job" and "must be spread very thin." *id.*, but nonetheless noted he too was "frustrated that [Lyon] is not finding people." *Id.* Carraro also testified he recalled Brightman expressed Lyon might not be the right person for the job before the Thanksgiving break in November 2020. Def. 56.1 ¶ 63.

Brightman continued to articulate concerns throughout Lyon's tenure. On November 18, 2020, Brightman texted Carraro and Associate Producer Megan Jahoda stating he wanted to replace Lyon as soon as possible. ECF No. 71-27. And on January 28, 2021, Brightman wrote that he was "losing faith in [Lyon's] department and their ability to handle this show," and specifically stated "[Lyon] has not been able to find staff from the beginning" and it is "clearly not her strength . . . ." ECF No. 71-31 at BC 00263.

### E.    Lyon and Departmental Staffing

Lyon's tenure involved notable employee turnover. Lyon's first hire was Shawn Godfrey who started on November 2, 2020; Godfrey served as Lyon's second-in-command. ECF No. 71-1 at 174:20–175:9; ECF No. 71-21. Godfrey resigned at the end of December 2020, sending an

email to Lyon on January 3, 2021, noting the "ongoing politics" and his belief he "never felt we were doing a good job." ECF No. 71-1 at 175:10–12; ECF No. 71-25. Lyon also hired Christopher Dea (a male employee) who quit for "personal reasons" after working only two days in mid-November 2020. ECF No. 71-1 at 183:2–5; ECF No. 71-26. Lyon hired Dea with the intention of him having a much higher-level job and higher level of pay, but he instead worked in a "lower-level position." ECF No. 71-1 at 183:6–17. Dea had various incidents with Brightman before his resignation, though he denied those incidents were the cause of his departure from the Production. ECF No. 71-1 at 183:23–185:17. Lyon claimed that Brightman was accusatory, intimidating, and aggressive towards Dea. Def. 56.1 ¶ 62.

Several members of the Production observed, acknowledged, or stated the COVID Department was not adequately staffed, including Lyon herself. On January 26, 2021, Lyon emailed Carraro and Brightman noting that her workload is unbearable for one person and regretting she is "tasked with finding [her] own employees when [she] needs to focus on work." ECF No. 71-31 at BC 00259.; Def. 56.1 ¶ 70. Employees in Lyon's department also made requests for more staffing on December 2, 2020, and again on January 29, 2021. Def. 56.1 ¶ 65; ECF No. 71-28. Other Production members espoused similar views. For instance, on January 26, 2021, in a discussion concerning Lyon's email from the same date, Michael Elias (Executive Vice President, Head of Production) wrote "[s]ounds like [Lyon] is just an individual and does not have a Company behind her hiring or providing support." ECF No. 71-31 at BC 00260. LaChondra Washington, the Human Resources Director, also texted Elias on January 27, 2021, that she spoke to Lyon, and that Washington "understands why [Lyon] is overwhelmed. She is doing the work that is normally covered by many people . . . ." ECF No. 87-10.

Despite acknowledging this issue, several Production members attributed fault to Lyon for the understaffing. For instance, Carraro responded to Lyon's January 26 email acknowledging

she is "under supported" and just "one person working under a great deal of pressure" but that it was important she "make [her] choices as soon as possible and get help on board." ECF No. 71-31 at BC 00260. And Elias noted that normally, the health and safety officers are meant to be "secured by the COVID Supervisor"—namely, Lyon. ECF No. 87-10.

By February 12, Lyon's team had grown to 17 employees. Def. 56.1 ¶ 180. Although Lyon made several of those hires, many were also brought in by others. For example, in January 2021, Brightman and Carraro contacted a consulting company to assist with getting additional COVID Department members. ECF No. 71-31 at BC 00264–67. Brightman also identified John McCullough to be Lyon's second-in-command; Lyon and Perkins interviewed him by Zoom on February 3, 2021, and subsequently hired him. Def. 56.1 ¶¶ 76–77; ECF No. 71-1 at 191:8–24; ECF No. 71-33. However, McCullough stopped reporting to work by his third day. ECF No. 71-1 at 192:3–6. Lyon also hired Rachel Dougherty as a COVID PA, but she worked "less than a day and resigned" and Lyon testified it was because the Production location was too far. ECF No. 78-3 at 189:2–23.

### F.    Lyon and the "Long Form"

Aside from hiring and management, Lyon had a responsibility to contribute to the "Long Form." The Long Form is a document that details how a production is going to address COVID-19. It requires "people from numerous backgrounds and departments to put together." ECF No. 78-2 at 17. Lyon testified she understood that the Production expected her to "tackle" the Long Form (among other things) with high priority when she started. ECF No 71-1 at 107:23–108:10; *see also* ECF No. 71-13 at P 0002837–38. The Long Form needed to be completed and approved before filming could begin. ECF No. 71-1 at 108:14–18. The target date to begin filming was February 8, 2021. ECF No. 71-1 at 163:12–15.

10

On December 9, 2020, Lyon submitted a draft Long Form to David McElwain and LaChondra Washington. ECF No. 71-37. Washington responded on December 17 with suggested revisions, stating the form "looks good and is almost there." *Id.* Plaintiff did not respond to this email. Def. 56.1 ¶ 92.

A few weeks later, on January 5, 2021, Plaintiff reached out to Washington for assistance in completing the Long Form because she was "having difficulty." ECF No. 71-1 at 157:7–14. Washington and Lyon had a call that same day, ECF No. 71-38, and Washington took notes. ECF No. 71-39. As to the Long Form, Washington's notes indicate Lyon conveyed "no long form yet" and that "they" told her she "failed" and handed it off to William Perkins. *Id.* at POSSIBLE PRODUCTIONS 000974.

On February 2, 2021, Lyon sent an incomplete draft of the Long Form to Washington, saying it was "not put together" and would be "embarrassing to send out to everyone." Def. 56.1 ¶ 102. Lyon reiterated the same sentiment the following day, calling the draft a "mess" and "embarrassing." *Id.* ¶ 103. On February 4, several Production members (including Lyon) and studio representatives met to discuss the draft Long Form, and Plaintiff testified it went "poorly" as "it became more and more obvious" it was not what they needed. ECF No. 71-1 at 161:12–163:3.

Given the close proximity to the February 8 date to begin filming, following the meeting, other members of the Production—such as Perkins, Megan Jahoda (Associate Producer), Damon Gordon (whole title is not clear from the record), and David McElwain (Vice President, Environmental, Health and Safety)—assisted to finalize the Long Form. ECF No. 71-1 at 164:10–25; ECF No. 71-44. The Long Form was ultimately completed on February 8, 2021. Def. 56.1 ¶ 110.

In sum, while Lyon testified that she understood the Long Form to be a priority as soon as she was hired, ECF No 71-1 at 107:23–108:7; *see also* ECF No. 71-13 at P 0002837, she experienced challenges in completing it, and ultimately received input from other Production members in order for the Long Form to be completed by February 8.

### G.    Lyon's Interactions with Other Employees

Lyon had altercations with other Production members, some of which caused employees to resign or complain to management. For example, on February 16, 2021, Taylor Rierden, the Production Wardrobe Supervisor, complained that Lyon ignored emails and disregarded questions. ECF No. 71-50. Also in February 2021, Rose Mitchell, a production assistant, complained about unsafe conduct and mistreatment by Lyon. Def. 56.1 ¶ 127. On February 24, 2021, a Local 161 union representation complained about "toxic and abusive behavior" by Lyon. *Id.* ¶ 131. Lyon also had an incident with Alyssa Boffoli, an employee in her department, where she complained that Boffoli "overrode [her] clear direction" regarding protocols and described her behavior as "insubordination" and recommended that she be suspended. ECF No. 71-35 at P 0000033–34.

Both Carraro and Brightman received complaints about Lyon from other employees. Carraro testified Lyon had "friction" with several other Production members, ECF No. 71-5 at 119:11–120:2, and that he received more complaints about Lyon than he did about other department heads (though he acknowledged COVID was new to everyone). *Id.* at 120:3–9. However, in January 2021, Carraro indicated he was perplexed by complaints about Lyon. ECF No. 78-69. Toward the end of Lyon's employment, Brightman testified he received daily calls from people complaining about Lyon's behavior toward them. ECF No. 71-4 at 141:14–142:5. This included anonymous complaints. ECF No. 71-51.

William Perkins also specifically identified Lyon as part of the reason for his decision to resign. Joint SMF ¶ 13; ECF No. 71-36. In a February 16, 2021, email, Perkins claimed that working with Lyon "became impossible," that she threatened to fire COVID department employees without transition plans, and that she incorrectly interpreted key information. *Id.* Perkins also wrote that other department heads and crew members repeatedly came to him frustrated and angry about Lyon. *Id.*

### H.    Lyon's Interactions with and Complaints about Brightman

While Lyon told LaChondra Washington that she and Brightman "got along great at first," ECF No. 71-39 at POSSIBLE PRODUCTIONS 000969, Lyon complained of altercations and disagreements with Brightman.

For example, LaChondra Washington's notes from a January 5, 2021 call with Lyon reflect that Lyon raised concerns regarding how Brightman treated her. Lyon complained that she did not see Brightman treating other department heads that way, ECF No. 71-39 at POSSIBLE PRODUCTIONS 000973, and that she could not do her job because of their dynamic. *Id.* Lyon also complained that she received "menial tasks that were not as important" and that Brightman "immediately had an attitude" and would doubt her ability by saying things like "I don't believe you" and "I need someone to check into this." *Id.* Lyon also complained that she had "never been disrespected like this" on a production. *Id.* at POSSIBLE PRODUCTIONS 000971. Lyon, however, did "not want to say it was sexism or its (sic) because the other women on the show are younger." *Id.* at POSSIBLE PRODUCTIONS 000974. Washington also testified her recollection was that Lyon "had concerns of not being recognized as the department head." ECF No. 87-2 at 87:20-88:1. Lyon also complained that Perkins did not appear to have any experience, saying he was a "[n]ice guy but he doesn't know a thing about production" and that he also apparently said,

to Lyon, "I don't know about Zones, Pods, nothing." ECF No. 71-39 at POSSIBLE

PRODUCTIONS 000970.

Shortly thereafter, Washington discussed the January 5 call with David McElwain and

Michael Elias. ECF No. 78-7 at 73:20–74:1; ECF No. 87-2 at 83:19–84:3. Washington testified

she informed McElwain to make him aware "of his employee's concerns" and informed Elias

because "he oversaw the production." ECF No. 78-1 at 74:9–18. Washington had a call with

Elias on January 7, 2021, and she took notes. ECF No. 87-2 at 82:19–22; ECF No. 78-69.

Washington testified that her interpretation of the notes was that "Bill and Adam confirmed for

Michael Elias that 100 percent, Jen is the department head" and that both Bill and Adam

confirmed to Elias they like and support her. ECF No. 87-2 at 84:14–22.

On February 11, Lyon emailed David McElwain complaining about a number of events

she felt "[was] intensely harassing behavior" and that Brightman was "creating an atmosphere

where [Lyon was] paralzed (sic) in trying to do [her] job." ECF No. 78-59 at POSSIBLE

PRODUCTIONS00000557-0001. Four days later, as discussed below, Lyon submitted a formal

complaint against Brightman.

Despite Lyon's complaints, Carraro and Perkins both testified they never observed

Brightman treating Lyon in an inappropriate manner or heard him make any comments regarding

Lyon's age or gender. ECF No. 71-5 at 122:3–17; ECF No. 71-3 at 161:4–22.

## I.    Lyon's Internal Complaint & Termination

At various times throughout Lyon's employment, Carraro and Brightman expressed the

possibility of replacing her, *see supra* § I(D), and eventually did so in February 2021. In early

February, the Production was searching for replacement options for Lyon. ECF No. 71-5 at

106:3-21. Brightman first communicated with Daniel Conklin and Avacet Conklin—a male and

female team wrapping up a different Netflix production in Massachusetts—a few days before

February 11 as potential replacements for Lyon. ECF No. 71-4 at 124:24–125:22. As of February 11, 2021, the decision had been made to replace Lyon. ECF No. 71-5 at 105:2–106:13. On February 11 and 12, Brightman asked Lyon to prepare a staff list of COVID department personnel with a quick summary of each person's job duties. Def. 56.1 ¶ 141. On February 12, Brightman emailed Michael Elias that they were "actively looking for a replacement for Jen Lyon, who is, to not mince words, mis-managing the department and incapable of handling the sow." ECF No. 71-59. That same day, Daniel Conklin's resume was circulated among Brightman, Carraro, Jahoda, Elias, and others. ECF No. 71-61. The group had a Zoom meeting to discuss replacing Lyon with the Conklin team. Def. 56.1 ¶ 148.

On February 15, 2021,[3] Lyon emailed an internal complaint (the "Internal Complaint") to LaChondra Washington, the Human Resources Director, alleging a "hostile work environment." Joint SMF ¶ 14; ECF No. 71-63. The Internal Complaint referenced specific incidents with Brightman, recited an "outline" of key issues, and articulated the effect it was having on Lyon. The Internal Complaint also noted that Lyon spoke to another female department head who was "experiencing the same treatment" from Brightman. *Id.* at JL000055.

The Internal Complaint generally focused on three areas: (1) altercations or interactions Lyon had with Brightman; (2) details regarding the lack of support, instruction, and information Lyon experienced; and (3) Lyon's interaction with Perkins vis-à-vis Brightman. For instance:

i.   Lyon wrote that she felt dismissed, that Brightman "purposefully derail[ed]" her ability to perform her job, undermined her authority with other Production members, and that because of his behavior, she developed "severe insomnia" and felt "bullied daily." *Id.* at JL000055–56. Lyon suggested that Brightman targeted her specifically, including by telling her he was unhappy with how much she was being paid, shutting off his camera on Zoom meetings only when she spoke, and telling her "daily" that she "had no production experience." *Id*

---

[3] While Lyon titled the complaint with a February 13 date, Lyon clarified she began the document on that date, but did not send it until February 15. ECF No. 71-1 at 224:3–225:12.

    ii.    Lyon wrote that she "was given the Long Form to prep by [herself] in no uncertain terms" and that despite asking for information to complete it, she "received no help." *Id.* at JL000055.

    iii.   Lyon wrote that Brightman "made it clear" she had to run everything past Perkins and that Brightman "listed [Perkins] above [her] in every document he could." *Id.* Lyon explained she had to train Perkins "in every aspect of COVID," and that despite him ostensibly being in charge, "[a]ny problems with the [health and safety] department were [her] fault solely . . . ." *Id.* at JL000055–56.

Jennifer Baker, Vice President of Employee Relations, investigated the Internal Complaint. Joint SMF ¶ 15. Baker interviewed Lyon on two separate occasions and invited her to submit documentation in support of her claims. Def. 56.1 ¶ 156, 159. Baker also interviewed Brightman and 14 other individuals. *Id.* ¶ 159. The results of the investigation were communicated to Lyon in a closure letter on February 23, 2021. Joint SMF ¶ 16. The investigation found that Lyon's claims could not be substantiated. ECF No. 1-13 ("Closure Letter"). However, the Closure Letter did note "there is a perception, among both female and male staff, that Mr. Brightman can be dismissive and negative when communicating and interacting with colleagues." *Id.* This is consistent with Lyon's own view, who testified Brightman could be rude or dismissive regardless of gender or age. ECF No. 71-1 at 264:16–23.

The Production terminated Lyon on February 26, 2021. Joint SMF ¶ 17. Lyon was not the only department head to be fired from the Production: a male department head (construction coordination) described as not "strong enough for the job" and "falling behind and failing" was also terminated before Lyon. ECF No. 71-4 at 175:1–24; ECF No. 71-5 at 121:1–21. Lyon testified that during her time working on the Production, Brightman never made any derogatory comments regarding her gender or age. Def. 56.1 ¶ 169–171. Lyon was paid what she was owed for the final pay period of her employment. Def. 56.1 ¶ 205. `

The Conklin team was hired to replace Lyon the same day she was fired on February 26, 2021. Def. 56.1 ¶ 164. The Conklins resigned in May 2021 for personal reasons. Def. 56.1 ¶ 167.

Thereafter, Melissa Buriak was hired as the HSS on the Production and remained in the position until the Production wrapped in July 2021. *Id.* ¶ 168.

## II.    Procedural History

Plaintiff timely filed charges of employment discrimination with the Equal Employment Opportunity Commission ("EEOC") and received Notices of Right to sue on August 1, 2022. ECF No. 1-1. Plaintiff filed this action on October 27, 2022 seeking compensatory and punitive damages, attorneys' fees and costs, treble damages, and declaratory and injunctive relief under Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act of 1967 ("ADEA"), the Massachusetts Law Against Discrimination ("MLAD"), Mass. Gen. Laws ch. 151B, §4, and the Massachusetts Wage Act ("MWA"), Mass. Gen. Laws ch. 149, §150. ECF No. 1 ("Compl."). Plaintiff asserts four claims under these respective statutes: (1) discrimination based on sex and age; (2) harassment based on a hostile work environment; (3) retaliation; and (4) unpaid wages. Defendants filed an answer to the Complaint on January 20, 2023. ECF No. 17.

On August 16, 2024, Defendants filed the instant motion for summary judgment as to all of Plaintiff's claims, as well as a motion for sanctions arguing that Plaintiff failed to preserve, and therefore produce, any text messages from the time she worked on the Production. ECF Nos. 65–72.

## LEGAL STANDARD

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of demonstrating the absence of a question of material fact. *Celotex Corp.*, 477 U.S. at 22. If the movant meets its initial burden, "the nonmoving party must come

forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal citation omitted).

When the movant properly supports its motion with evidentiary materials, the opposing party must establish a genuine issue of fact by citing "particular parts of materials in the record" to survive the summary judgment motion. Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "Only disputes over facts that might affect the outcome of the suit under the governing law" preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) (quoting *Stern v. Trustees of Columbia Univ. in City of New York*, 131 F.3d 305, 312 (2d Cir. 1997)). "The function of the district court in considering [a] motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kee v. City of New York*, 12 F.4th 150, 166–67 (2d Cir. 2021) (internal quotation marks and citation omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *S. Katzman Produce Inc. v. Yadid*, 999 F.3d 867, 877 (2d Cir. 2021) (internal citation omitted).

## DISCUSSION

This discussion proceeds in five sections. First, the Court determines that Plaintiff cannot establish a prima facie case of sex or age discrimination under Title VII or the ADEA because

she does not provide an adequate comparator to support an inference of disparate treatment, nor does Brightman's alleged conduct itself raise an inference of discriminatory intent. Second, the Court determines that Plaintiff cannot demonstrate a prima facie case of retaliation because her January 2021 call did not constitute protected activity, and because the Production made the decision to terminate her before she filed her Internal Complaint. Third, the Court finds that Plaintiff has abandoned her federal and state hostile work environment claims and has also abandoned all her claims under the Massachusetts Law Against Discrimination by failing to address them in her opposition. Fourth, the Court determines Defendants are entitled to summary judgment on Plaintiff's claims for unpaid wages because Plaintiff has not provided evidence to permit a reasonable jury to find she has not been paid all owed wages. Finally, the Court denies Defendants' motion for sanctions as moot.

## I.    Plaintiff's Federal Discrimination Claims Do Not Survive Summary Judgment

Plaintiff has alleged age and sex discrimination under Title VII and the ADEA, but has provided no direct evidence of discriminatory conduct by Brightman. The burden shifting framework established by *McDonnell Douglas*, 411 U.S. 792, 802–03 (1973), where a plaintiff alleges discrimination based on circumstantial evidence, therefore applies to Plaintiff's discrimination claims under both statutes. *See Carr v. New York City Transit Auth.,* 76 F. 4th 172, 177 (2d Cir. 2023) ("Discrimination claims under Title VII, the ADEA, and Section 1981 are analyzed under the *McDonnell Douglas* burden-shifting framework.").

The first step of *McDonnell* imposes a "de minimis" burden on Plaintiff to establish a prima facie case, *Abdu-Brisson v. Delta Air Lines, Inc*., 239 F.3d 456, 467 (2d Cir. 2001), and the Second Circuit has instructed courts to "remember this exceedingly low burden." *Dawson v. New York City Transit Authority*, 624 F. App'x 763, 770 (2d Cir. 2015) (internal citations omitted) (summary order). To establish a *prima facie* case of discrimination under Title VII and the

ADEA, Lyon must demonstrate: (1) she belongs to a protected class; (2) she was qualified for the position she held; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015).

For the second step, if Lyon can make out a prima facie case, the burden then shifts to Defendants to "proffer some legitimate nondiscriminatory reason for the adverse action." *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010).

For the third and final step, the analysis differs slightly between Title VII and the ADEA. Under Title VII, Lyon must then present sufficient admissible evidence "to permit a rational finder of fact to infer that Defendants' employment decision was more likely than not based in whole or in part on discrimination." *Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 75 (2d Cir. 2016) (cleaned up). But under the ADEA, Lyon "must prove, by a preponderance of the evidence, that age was the but-for cause of the challenged adverse employment action and not just a contributing or motivating factor." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010) (internal citation and quotation marks omitted); *accord Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F. 4th 293, 303 (2d Cir. 2021). In the end, "[t]he plaintiff bears 'the ultimate burden of persuading the court that she has been the victim of intentional discrimination.'" *Carr*, 76 F. 4th at 177 (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981)).

As set forth below, this Court finds that Defendants are entitled to summary judgment on Plaintiff's federal discrimination claims because she cannot make out a prima facie showing of discrimination by reference to an appropriate comparator or based on Brightman's conduct.

**A.      Plaintiff's Federal Claim for Sex Discrimination Does Not Survive Summary Judgment**

There is no genuine dispute that Plaintiff satisfies the first three elements in establishing a prima facie case of sex discrimination. First, Plaintiff, as a woman, belongs to the protected class of sex under Title VII. 42 U.S.C. § 2000e(k). Second, Defendants do not dispute that Lyon was qualified for her position. Third, Lyon's "[t]ermination is an adverse employment action because it constitutes a material change in the conditions of employment." *Conklin v. U.S. Immigration and Customs Enforcement*, 661 F. Supp. 3d 239, 262 (S.D.N.Y. 2023). Defendants only contest the fourth element, asserting they are entitled to summary judgment because Plaintiff has not raised an issue of material fact that her discharge occurred under circumstances giving rise to discriminatory intent. ECF No. 72 ("Mem.") at 12–15.

For the fourth element, it is well settled that showing disparate treatment "is a recognized method of raising an inference of discrimination for the purposes of making out a prima facie case." *Raspardo v. Carlone*, 770 F.3d 97, 126 (2d Cir. 2014) (quoting *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 493 (2d Cir. 2010)). "Raising such an inference, however, requires the plaintiff to show that the employer treated him or her 'less favorably than a similarly situated employee' outside of the protected group." *Id.* (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)). The law permits a plaintiff to raise a plausible inference of discrimination by alleging "preferential treatment given to similarly situated individuals . . . so long as the alleged comparators are similarly situated in all material respects." *O'Toole v. Cnty. of Orange*, 255 F. Supp. 3d 433, 439 (S.D.N.Y. 2017) (cleaned up). "An employee is similarly situated to co-employees if they were (1) 'subject to the same performance evaluation and discipline standards' and (2) 'engaged in comparable conduct.'" *Ruiz*, 609 F.3d at 493–94 (quoting *Graham*, 230 F. 3d at 40). "[T]he standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." *Id.*

Plaintiff argues she was similarly situated to Perkins but treated more harshly. Drawing inferences in Plaintiff's favor, a reasonable jury could conclude that Lyon and Perkins were similarly situated with respect to their responsibilities and positions. For one, both Lyon and Perkins reported to Brightman and Carraro. ECF No. 79 ¶ 44. For another, Plaintiff has presented evidence that Perkins was part of the "Health and Safety Department," and that Perkins shared certain responsibilities with Lyon. Brightman also specifically instructed Lyon to allow Perkins to communicate with other department heads, ECF No. 79 ¶¶ 41–42, and LaChondra Washington's January 5, 2021 call notes indicate Lyon complained that Brightman had reassigned the Long Form to Perkins because Lyon "failed." ECF No. 71-39 at POSSIBLE PRODUCTIONS 000974. And in the Internal Complaint, Lyon wrote that she was instructed to run everything by Perkins first. ECF No. 71-63 at JL000055. Perkins was also portrayed as part of the Covid Department to other Production members. *See, e.g.,* ECF No. 78-64 at P 0001607.

However, there is no genuine issue of material fact that Perkins did not engage in conduct of "comparable seriousness" as Lyon. "A proposed comparator is not similarly situated in all material respects unless [they] engaged in all of the same misconduct as plaintiff, or at least committed the most serious of the infractions for which the plaintiff was subjected to an adverse employment action." *Risco v. McHugh*, 868 F. Supp. 2d 75, 100 (S.D.N.Y. 2012) (internal citation and quotation marks omitted); *Osekavage v. Sam's East, Inc*., 619 F. Supp. 3d 379, 391 (S.D.N.Y. 2022) (same).

Here, Defendants have provided undisputed evidence demonstrating that employees resigned specifically because of Lyon, Lyon's conduct was labelled "toxic," Lyon failed to fulfill at least some of her job responsibilities (like hiring staff), and that Brightman and Carraro received numerous complaints about Lyon. *See supra,* Background §§ I(D)–(G). The record also reveals express concessions by Lyon that she was not meeting deliverables or deadlines. *See,*

*e.g.,* Def. 56.1 ¶¶ 102, 103. Plaintiff has not offered any evidence of this sort with respect to Perkins.

Moreover, Defendants have presented evidence that a potentially proper comparator on the Production—a male department head (construction coordinator)—was fired for similar reasons as Lyon. ECF No. 71-4 at 175:1–24; ECF No. 71-5 at 121:1–21. Plaintiff has offered no evidence to create a dispute of material fact on these points. *See Jessamy v. City of New Rochelle*, 292 F. Supp. 2d 498, 516 (S.D.N.Y. 2003) (concluding the plaintiff failed to establish a prima facie case of discrimination where employee outside his protected class was treated identically).

Aside from a comparison to Perkins, Lyon also argues that Brightman's treatment of her can itself give rise to an inference of discriminatory intent. ECF No. 83 ("MSJ Opp.") at 14–20. As noted previously, Plaintiff has complained about a series of insults and slights she faced at the hands of Brightman. For instance, Brightman told Lyon he did not like how much money she made, even though she had a similar rate of pay as Perkins. ECF No. 71-63 at JL000055–56. Lyon also complained that Brightman often second-guessed her decisions and undermined her authority in front of staff. *See supra,* Background §§ I(H) & (I). But there's no evidence for a reasonable jury to infer that this conduct was based on her sex. Indeed, Lyon herself testified Brightman could be rude or dismissive regardless of gender, ECF No. 71-1 at 264:16–23, and that he never made comments about her gender. Def. 56.1 ¶¶ 169–171.

The Court does find, however, that Lyon could meet her "minimal" burden to satisfy the first step of *McDonnell* by reference to Brightman forcing her to report to, and run everything by, Perkins. ECF No. 71-63 at JL000055. Lyon complained that Perkins "doesn't know a thing about production" and that Perkins admitted as much by saying to Lyon, "I don't know about Zones, Pods, nothing." ECF No. 71-39 at POSSIBLE PRODUCTIONS 000970. The parties do not dispute Lyon was qualified for her position. Thus, someone with Lyon's experience having to run

things by a man with less experience could raise an inference of gender discrimination at the "minimal burden" first step.

However, the remaining *McDonnell* analysis can be dealt with summarily on the undisputed facts. Defendants have satisfied the second step of *McDonnell* to provide a nondiscriminatory reason for Lyon's discharge. As discussed above, Defendants have provided undisputed evidence that Lyon was fired for poor performance by failing to hire and retain employees and by having recurring confrontations with staff. Mem. at 17–18; *see supra*, Background §§ I(D)–(G). To succeed at step three of *McDonnell*, Plaintiff would need to show that her termination was pretextual and more "likely than not" based in whole or in part on discrimination. *Walsh,* 828 F.3d at 75. While Plaintiff narrowly adduced sufficient evidence to meet her "minimal burden" for step one, she has not adduced or pointed to any stronger evidence "that would allow a reasonable factfinder to conclude that, in the face of the serious (and documented) [issues]" about her time at the Production, that her termination was pretextual. *Perez-Dickson v. Bridgeport Board of Education*, 860 F. App'x 753, 756 (2d Cir. 2017) (summary order) (affirming dismissal of § 1983 race discrimination on summary judgment); *see White v. Roosevelt Union Free Sch. Dist. Bd. of Educ.*, No. 15-CV-1035(JS), 2025 WL 552744, at *19 n.14 (E.D.N.Y. Feb. 19, 2025) (same analysis under Title VII and § 1983 for discrimination claims at summary judgment stage). Accordingly, the Title VII sex discrimination claim does not survive summary judgment.

**B.    Plaintiff's Federal Claim for Age Discrimination Does Not Survive Summary Judgment**

Based on the above analysis, the Court can also conclude that Plaintiff cannot make out a prima facie case of age discrimination. *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015) (stating that although the pleading standard is more relaxed for Title VII

24

claims alleging discrimination, a plaintiff alleging age discrimination must allege that age was a "but for" cause of the adverse action). Like the sex discrimination claim, Plaintiff can easily establish the first three elements: she was over 40 years old while at the Production (Joint SMF ¶ 3; 29 U.S.C. §§ 623(a), 631), Defendants do not contest her qualifications for the job, and she suffered an adverse employment action through her termination (Joint SMF ¶ 17). But Lyon has only pointed to Perkins as a comparator, and Perkins falls in the same protected class of age because he is older than Lyon. Joint SMF ¶ 12. And to the extent Lyon relies on Brightman's conduct more generally, Lyon having to report to Perkins would not raise any inference of age discrimination given he is *older* than Lyon. Joint SMF ¶ 12. Thus, as to the age discrimination claim, Plaintiff fails at the first step of *McDonnell*. And in any event, Defendants would satisfy step two of *McDonnell* to provide a nondiscriminatory explanation for Lyon's termination, and Plaintiff would fail at step three with greater force. Unlike the "more relaxed" standard of Title VII, under the ADEA, Lyon needed to adduce sufficient evidence that her age was a "but-for" cause of Brightman's conduct or her termination. *Vega*, 801 F.3d at 86. She has failed to do so.

Accordingly, Plaintiff has failed to establish a prima facie case of age discrimination under the ADEA, and so the claim does not survive summary judgment. *Puleo v. Masonic Med. Rsch. Inst.*, No. 23-7589, 2025 WL 45393, at *3 (2d Cir. Jan. 8, 2025) (affirming dismissal of ADEA discrimination claim because a reasonable factfinder could not find that the plaintiff's firing was pretextual and that age discrimination was a but-for cause of her termination).

## II.    **Plaintiff's Federal Retaliation Claim Does Not Survive Summary Judgment**

The *McDonnell* framework also applies to Plaintiff's retaliation claim under Title VII and the ADEA. *Carr*, 76 F.4th at 178 (observing the *McDonnell* framework applies to retaliation under Title VII and the ADEA). To establish a prima facie case of retaliation, a plaintiff must demonstrate that (1) she engaged in a protected activity, (2) the defendant was aware of that

activity, (3) she was subjected to a retaliatory action, or a series of retaliatory actions, that were materially adverse, and (4) there was a causal connection between the protected activity and the materially adverse action or actions. *Id.* at 180. Plaintiff claims she was retaliated against after engaging in "protected activities" beginning in January 2021 in the form of "escalating" conduct by Brightman and her eventual termination in February 2021. MSJ Opp. at 21–22. While Plaintiff does not specify exactly what the protected activities were, the Court understands Plaintiff to be referring to a January 5, 2021 call with LaChondra Washington, the Human Resources Director, and the Internal Complaint she filed on February 15, 2021 (and previewed by email on February 11, 2021).[4] As set forth below, Plaintiff cannot make out a *prima facie* case of retaliation and again falters at the first step of *McDonnell*.

A.       **The January 5, 2021 Call Was Not a "Protected Activity"**

Plaintiff cannot make out a prima facie case of retaliation as to the January 5, 2021 call because it did not constitute a protected activity. "'Protected activity'" refers to 'opposing any practice made unlawful by Title VII' or 'making a charge, testifying, assisting, or participating in formal EEOC proceedings' involving Title VII." *Lee v. Grocery Haulers, Inc*., 2023 WL 8253089, at *3 (2d Cir. Nov. 29, 2023) (cleaned up) (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 316 (2d Cir. 2015)). "While informal complaints do not need to use the word discrimination to put the employer on notice, they do need to suggest that the complained-of activity is unlawfully discriminatory." *Gurley v. David H. Berg & Assocs.*, No. 20-CV-9998 (ER), 2022 WL 309442, at *7 (S.D.N.Y. Feb. 2, 2022).

---

[4] Plaintiff also appears to suggest that exercising her authority as HSS to shut down filming (MSJ Opp. at 22) and enforce safety protocols (MSJ Opp. at 23) constituted "protected activities." That is incorrect, as nothing about that activity involves opposing or complaining of a discriminatory practice.

During the call, Lyon complained she did not see Brightman treating other department heads the way he treated her, ECF No. 71-39 at POSSIBLE PRODUCTIONS 000969, and Brightman "immediately had an attitude" with her and would doubt her ability by saying things like "I don't believe you" and "I need someone to check into this." *Id*. These kinds of generalized grievances were not sufficient to put Washington on notice of discriminatory conduct. *See Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011) ("The competent evidence in the record showed that any complaints [plaintiff] made were generalized and therefore [Defendant] could not reasonably have understood that she was complaining of 'conduct prohibited by Title VII.'") (quoting *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)).

LaChondra Washington's call notes also indicate Lyon stated she did "not want to say it was sexism or its (sic) because the other women on the show are younger." POSSIBLE PRODUCTIONS 000974. This statement could be understood literally, but it could also be interpreted as Lyon wanting to discreetly raise the possibility of discrimination while not directly accusing Brightman of discrimination. However, there is no genuine issue of material fact that Washington did not understand Lyon's report to be a complaint of discrimination. Washington had a call with Elias on January 7, 2021, and she took notes. ECF No. 87-2 at 82:19–22; ECF No. 78-69. Washington testified her interpretation of the notes was that "Bill and Adam confirmed for Michael Elias that 100 percent, Jen is the department head" and that both Bill and Adam confirmed to Elias they like and support her. ECF No. 87-2 at 84:14–22. Washington also testified her recollection was that Lyon "had concerns of not being recognized as the department head" which she brought to Elias's attention. *Id.* at 87:20–88:1.

Thus, Plaintiff has not adduced sufficient evidence to create a dispute of fact regarding whether the call constituted protected activity. Accordingly, the January 5, 2021 cannot serve as a basis for Plaintiff's claims for retaliation.

### B. The February 11 Email, Which Became the February 15 Internal Complaint, Does Not Support a Retaliation Claim

The Court similarly concludes that the February 11 email from Lyon, in which she stated she would later be providing a list of problematic conduct by Brightman (ECF No. 78-59 at POSSIBLE PRODUCTIONS00000557-0001) that eventually became the Internal Complaint (ECF No. 71-63) cannot support a prima facie claim of retaliation.

In contrast to the January 5, 2021 call, here, Lyon easily satisfies the first two elements in making out a prima facie case. The Internal Complaint, which Lyon sent to LaChondra Washington, plainly qualifies as "protected activity" for the purposes of Lyon's retaliation claim. ECF No. 71-63. Lyon titled the complaint "Report of Hostile Work Environment," and referenced, among other things, her conversation with another female head of department who she claimed was experiencing "the same sexism" as her. *Id.* at JL000055.

Plaintiff fails, however, to establish she suffered a retaliatory action in close temporal proximity to the Internal Complaint. Plaintiff claims she was "excluded from critical meetings on February 5, 2021" and terminated within two weeks of submitting the Internal Complaint. MSJ Opp. at 22. The former, of course, occurred prior to the Internal Complaint, and is thus irrelevant. With respect to Lyon's termination, while the Production terminated her within a few weeks of the Internal Complaint, there is no genuine dispute of fact that Brightman and Carraro decided to replace Lyon before she submitted the Complaint.

"It is well-settled that an adverse employment action cannot serve as the basis for a retaliation claim if the action was set in motion before a plaintiff engaged in protected activity."

*Cayemittes v. City of New York Dep't. of Hous. Pres. and Dev.*, 974 F. Supp. 2d 240, 262 (S.D.N.Y. 2013) (citing *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) and *Tomasino v. St. John's Univ.*, 476 F. App'x 923, 925 (2d Cir. 2012) (summary order)). In early February, before the February 11 email and the Internal Complaint, the Production was searching for replacement options for Lyon. ECF No. 71-5 at 106:3–21. Brightman first communicated with Daniel Conklin and Avacet Conklin—the two-person team that replaced Lyon—a few days before February 11 as potential replacements for Lyon. ECF No. 71-4 at 124:24–125:22. And it is undisputed that as of February 11, 2021, the decision had been made to replace Lyon. ECF No. 71-5 at 105:2–106:13. Accordingly, Lyon's retaliation claim does not survive summary judgment. *See Flores v. Entergy Nuclear Operations, Inc.*, 768 F. App'x 139, 149 (2d Cir. 2019) (summary order) (affirming dismissal of retaliation claim because, *inter alia*, the undisputed evidence showed the termination decision preceded the protected activity).

Moreover, to the extent Lyon points to Brightman's conduct more generally as retaliatory conduct, this too would fail to establish causation. This Circuit has "previously held that mere temporal proximity does not raise an inference of retaliatory intent sufficient to survive summary judgment." *Offor v. Mercy Medical Center*, 2023 WL 2579040, at *2 (2d Cir. Mar. 21, 2023). This is because "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery*, 248 F.3d at 95.

Lyon's retaliation claims thus do not survive summary judgment.

### III. Plaintiff Has Abandoned Her Harassment (Hostile Work Environment) and MLAD Claims

The Court need not address, and can summarily dismiss, Plaintiff's state claims under MLAD as well as her federal harassment claim because she has abandoned them. Nowhere in her

opposition does Plaintiff address Defendants' arguments concerning these claims, or otherwise argue she has made out a prima facie case for those claims or explained why they should survive summary judgment. As the Second Circuit has observed, "when a counseled party moves for summary judgment, a partial response [by the non-movant] arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims." *Moll v. Telesector Res. Grp., Inc*., 94 F.4th 218, 257 (2d Cir. 2024) (cleaned up) (quoting *Kovaco v. Rockbestos-Surprenant Cable Corp*., 834 F.3d 128, 143 (2d Cir. 2016)).

Plaintiff's opposition focused primarily on the federal discrimination claims, largely asserting the existence of sufficient evidence to create an issue of fact as to discriminatory intent. MSJ Opp. at 15–20. The opposition also addressed Plaintiff's retaliation claim. MSJ Opp. at 20–23. But with respect to these sections, Plaintiff only asserted she satisfied her burden under Title VII and the ADEA—indeed, MLAD is not mentioned once in her opposition. And Plaintiff's harassment claim—under both federal and state law—went completely unaddressed. In these circumstances, it is permissible to treat the claim as abandoned. *See BWP Media USA Inc. v. Polyvore, Inc*., No. 13-CV-7867 (RA), 2018 WL 11449489, at *1 (S.D.N.Y. Dec. 13, 2018) (finding it would have been proper to conclude the plaintiffs abandoned infringement claims where, among other things, they failed to mention them in opposing the defendant's motion or in their own cross-motion for summary judgment); *Marseille v. Mount Sinai Health System, Inc*., No. 18-CV-12136, 2021 WL 3475620, at *4 (S.D.N.Y. Sept. 26, 2023) (finding plaintiff abandoned her federal and state law claims by failing to respond to the defendants' arguments).

Accordingly, Plaintiff's harassment claims and state law claims under MLAD have been abandoned and do not survive summary judgment.

IV.    **Plaintiff's Breach of Contract and Unpaid Wages Claim Do Not Survive Summary Judgment**

The MWA provides a cause of action for employees who claim to be aggrieved under the Massachusetts wage laws. MASS. GEN. LAWS. CH. 149, § 150. Here, Plaintiff claims Defendants violated MASS. GEN. LAWS. CH. 149, § 148 (requiring employees to be paid weekly or biweekly, and to be paid in full on the day of any discharge, in a timely manner) and MASS. GEN. LAWS. CH. 151 §1A (requiring that overtime be paid). MSJ Opp. at 27–29. Plaintiff argues that Defendants violated both the terms of her contract and the MWA by apparently failing to pay her in full for all hours worked, including holiday pay for Thanksgiving, and by directing her not to record all of her hours. MSJ Opp. at 27. Lyon also argues that Defendants' requirement for pre-approval of additional work conflicts with the RTW Agreement.

Defendants seek summary judgment on these claims arguing Plaintiff has not furnished evidence to create a genuine dispute she has not been paid for all days worked or that the Return-to-Work Agreement constitutes a binding, enforceable contract. The Court agrees and grants summary judgment to Defendants on these claims.

A.    **Unpaid Wages Under Section 148 and Section 1A**

Under Section 1A, Massachusetts courts have noted the statute was "intended to be essentially identical" to Fair Labor Standards Act ("FLSA") unpaid overtime claims. *See Vitali v. Reit Management & Research, LLC*, 36 N.E.3d 64, 68 (Mass. App. Ct. 2015) (citing *Mullally v. Waste Mgmt. of Mass.*, 452 Mass. 526, 531 (2008)). Accordingly, Plaintiff must show (1) she incurred unpaid overtime work; and (2) that the employer had actual or constructive knowledge that she was working overtime. *Id.* at 69*; see also Perry v. City of New York*, 78 F.4th 502, 509 (2d Cir. 2023) (FLSA requires "an employer [to] pay for all work it knows about or requires, even if the employee does not specifically request compensation for it.").

31

Plaintiff fails to satisfy either of these elements for her claim. Section 1A (like FLSA) only applies to *unpaid* overtime work: Defendants have provided undisputed evidence (1) Lyon's request for approval for overtime was always granted (Def. 56.1 ¶ 204); (2) the one instance in the record when Lyon did not get approval (during her soft ramp up), she was nonetheless paid (Def. 56.1 ¶¶ 202, 203); and (3) that Lyon was paid for working a 6th day during the weeks of January 9, January 23, and January 30, 2021, and that she was paid for a 6th and 7th day the week of February 13, 2021. Def. 56.1 ¶ 202. Plaintiff has not furnished any evidence of any particular days or weeks she had not been paid, instead only asserting in conclusory fashion, that Defendants did not pay her for working on Thanksgiving. MSJ Opp. at 28. Nor has Plaintiff furnished evidence supporting her assertion that Brightman instructed her not to record her hours.[5] Even if Plaintiff had made this showing, she has furnished no evidence Defendants knew about any such overtime. None of the cited paragraphs from Lyon's counter 56.1 statement (¶¶ 75 and 83) address this issue, MSJ Opp. at 28, and she has not otherwise furnished evidence to create a dispute on this question.[6] *See Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (concluding that plaintiff "may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.") (internal citation omitted).

Plaintiff's claim under Section 148 similarly does not survive summary judgment. Under Section 148, Plaintiff must show "(1) [s]he was an employee under the statute; (2) [her] deferred

---

[5] Plaintiff cites Paragraphs 83 and 84 of her counter-statement of facts to support this assertion. MSJ Opp. at 28. However, the text messages referenced in paragraph 83 do not reference this subject at all (ECF No. 78-78), and the document purportedly discussed in paragraph 84 does not appear to have been provided to the Court. The Court sees no reference to the specific bates numbers anywhere in the Steiner declaration.

[6] Plaintiff cites deposition testimony from LaChondra Washington in support of her assertion she worked Thanksgiving and had been instructed not to record her time. ECF No. 79 ¶ 10. However, Plaintiff did not provide the cited transcript pages in the relevant exhibit (ECF No. 78-8) and so the Court cannot consider them.

compensation constitutes a 'wage' under the statute; and (3) the defendants violated [Section 148] by not paying [her] wages in a timely manner." *Roche v. Morgan Collection, Inc.*, 882 F. Supp. 2d 247, 253 (D. Mass. 2012) (cleaned up). As an initial matter, Plaintiff does not address the elements of Section 148 at all in her opposition or explain why they have been satisfied here. Moreover, given Lyon does not dispute that Defendants paid her what she was owed for her final pay period, Def. 56.1 ¶ 205, the Court understands Plaintiff to only be alleging Defendants have not timely paid her wages because they allegedly, to this day, have not paid her everything she is owed. But as discussed above, no genuine dispute exists on this point. Accordingly, Plaintiff's claim for unpaid wages pursuant to Chapter 149, Section 148 and Chapter 151, Section 1A do not survive summary judgment.

### B.    Unpaid Wages and Breach of Contract[7]

Massachusetts has made clear that an MWA claim does not pre-empt a breach of contract claim for lost or unpaid wages. *See Lipsitt v. Plaud*, 466 Mass. 240, 255 (2013) (concluding the legislature did not intend MWA to be the exclusive remedy for recovery of unpaid wages). "To prove a breach of contract under Massachusetts law, a plaintiff must show that there was a valid contract, that the defendant breached its duties under the contractual agreement, and that the breach caused the plaintiff damage." *Gibson Foundation, Inc. v. Norris,* 88 F.4th 1, 11–12 (1st Cir. 2023) (cleaned up).

Plaintiff's breach of contract claim can be dismissed summarily, given the Court has already determined there is no genuine issue of fact regarding the alleged breach. Because Plaintiff has not furnished evidenced to support an inference that she has not been paid for all

---

[7] While it is not technically clear from the record that the Deal Memo is even a "contract," the parties have not disputed this point, and so the Court will treat the Deal Memo as a contract for the sake of this claim.

hours worked, she cannot establish a breach of the relevant contract, and summary judgment must be granted to Defendants. *See In re Mirena IUS Levonorgestrel-Related Products Liability Litig. (No. II)*, 387 F. Supp. 3d 323, 336 (S.D.N.Y. 2019) ("Where a plaintiff cannot adduce proof sufficient to establish an essential element of her claim, there can be no genuine issue of material fact, because a 'complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'") (quoting *Celotex*, 477 U.S. at 322–23).

Moreover, the Deal Memo, which articulated Plaintiff's pay schedule, does not provide for holiday pay. ECF No. 71-8. The Deal Memo also makes clear the terms of the "Conditional Employment & Accounting Policies" governed Lyon's employment. *Id.* Per those policies, timecards were to be filled out weekly, and any overtime, 6th or 7th days, or holidays had to be approved by the Unit Production Manager or Producer (i.e., Brightman) in advance. Def. 56.1 ¶ 197. Nonetheless, Plaintiff argues the RTW Agreement supersedes the Deal Memo, and so Plaintiff was entitled to holiday pay on Thanksgiving. MSJ Opp. at 27. But Plaintiff has not pointed to anything in the RTW Agreement entitling her to holiday pay or suggesting the Deal Memo did not establish the terms of her payment at the Production. Indeed, the RTW Agreement only provided "[Lyon] shall be accessible at all times *during working hours* . . . ." ECF No. 78-21 at 15 (emphasis added). Both the Deal Memo and the RTW Agreement provide clear and unambiguous terms making summary judgment appropriate. *See Dreni v. PrinterOn America Corporation,* 486 F. Supp. 3d 712, 723 (S.D.N.Y. 2020) (citing *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011)) ("Summary judgment is appropriate where contractual terms are unambiguous."). And in any event, as discussed above, even if Lyon had been entitled to holiday pay, she has furnished no evidence to create an issue of fact as to whether she had been paid for all time worked.

**V.        Defendants' Motion for Sanctions is Denied as Moot.**

The Court has granted summary judgment to Defendants with respect to all Plaintiff's claims, and an adverse instruction or dismissal order would therefore be moot. Moreover, any adverse inference instruction would not affect the Court's prior analysis: the fact remains that due to Plaintiff's failure to preserve the text messages, they are not part of the record, and so she cannot create a dispute of material fact by reference to those text messages or the content of any such messages. Accordingly, the motion is denied.

<strong>CONCLUSION</strong>

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED, and their sanctions motion is DENIED as MOOT. The Clerk of Court is respectfully directed to terminate ECF Nos. 65 and 68, and to close this case.

Dated:  March 28, 2025
        New York, New York

SO ORDERED.

_____
JESSICA G. L. CLARKE
United States District Judge